In re **AUDRA–JOHN CORPORATION,**
Debtor.

**Bankruptcy No. 3–91–3786.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

May 28, 1992.

Ronald J. Walsh, Minneapolis, Minn., for debtor.

Douglas L. Hertlein, Columbus, Ohio, for Petland, Inc.

Julia A. Christians, Minneapolis, Minn., for Unsecured Creditors Committee:

Raymond Lallier, Minneapolis, Minn., for Citizens Independent Bank.

## ORDER GRANTING DEBTOR'S MOTION FOR APPROVAL OF REJECTION OF EXECUTORY FRANCHISE AGREEMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 11 case came on before the Court on March 3, 1992, for hearing on Debtor's motion for approval of its rejection of an executory franchise agreement with Petland, Inc. ("Petland"). Debtor appeared by its attorney, Ronald J. Walsh. Petland appeared by its attorney, Douglas L. Hertlein. Other appearances were noted in the record. Upon the moving and responsive documents, the evidence adduced at the hearing, and the arguments and post-hearing briefing of counsel, the Court makes the following order.

Debtor filed a voluntary petition for reorganization under Chapter 11 on July 11, 1991. Debtor operates a retail pet store at a location in the Knollwood Mall, St. Louis Park, Minnesota.[1] When Debtor filed for reorganization, Joseph H. Kaplan and Bruce I. Nathanson were its principals.[2] Petland is an Ohio-based corporation which franchises a merchandising system for the operation of retail pet stores under a prescribed format with distinctive trade and service marks.

On November 26, 1983, Petland, as franchisor, and Kaplan and Nathanson, as franchisees, had entered into a franchise agreement for the Knollwood Mall location. Kaplan and Nathanson later assigned their rights under this agreement to Debtor. Under the agreement, Petland licensed Debtor to use its trade and service marks and agreed to provide Debtor with advertising and promotional materials, management consulting, and various other forms of assistance. In return, Debtor was to comply with various operational standards, and was obligated to pay Petland a royalty fee based on a percentage of its gross sales. Debtor was entitled, but not obligated, to purchase supplies and inventory from Petland. The record does not reveal whether Debtor was obligated to maintain the floor layout of the store in a design mandated by Petland; section 7 of the franchise agreement does require Debtor to

---

**1.** When this case was commenced, Debtor also had a location in the Rosedale Mall in Roseville. On September 9, 1991, its premises lease for that location was deemed rejected by operation of 11 U.S.C. § 365(d). Debtor then terminated operations there. Petland did not object to court approval of the rejection of the separate franchise agreement for the Rosedale location; the Court dealt with that issue by a separate order.

**2.** Nathanson has since terminated his involvement with Debtor's management; Kaplan currently directs all operations.

comply with an operations manual promulgated by Petland, though, and it is likely that the manual prescribes store layouts.[3]

Section 13 of the agreement provided:

Upon termination of this agreement, for whatever cause, [Debtor] shall not for a period of three (3) years thereafter, or any lesser part thereof, as a court of competent jurisdiction finds to be reasonable, directly or indirectly engage in, have a financial interest or be associated in any manner with any business similar or substantially similar to the business authorized by [Petland] hereunder within a five mile radius, or any lesser part thereof, as a court of competent jurisdiction finds to be reasonable, of [Debtor's] operation pursuant to this agreement, or any other then existing Petland retail pet store. [Debtor] acknowledges that this prohibition is necessary and reasonable due to its being in possession of business methods, trade secrets, know-how and related matters, disclosure of which would prejudice the business operation and interests of [Petland] and its other licensees.

During Debtor's years of operation under the Petland franchise at the Knollwood Mall, it has invested between $130,000.00 and $150,000.00 in leasehold improvements to its premises there.

Petland itself is now a debtor under Chapter 11 in a case pending in the United States Bankruptcy Court for the Southern District of Ohio, having filed for relief on December 2, 1991. Petland has not furnished management or marketing consultation to Debtor for at least a year; it did not respond to Nathanson's overtures for a renegotiation of the royalty fee or other terms of the franchise relationship, when Debtor began to experience financial distress in early 1991; and Debtor has not had to purchase inventory or supplies from Petland for at least several months, having found such goods available locally for more prompt delivery at competitive prices.[4]

In the fall of 1991, Debtor received substantial adverse publicity as a result of a local television station's "investigative report" on its operations, which focused on alleged shortcomings in the care of its pet livestock.[5] After the broadcast, Debtor's sales volume dropped markedly. Debtor continued to use Petland's merchandising formats and trade and service marks until December 30, 1991. At that time, Kaplan substantially rearranged the internal layout of the store; removed the Petland designation from all signage, advertising, packaging, and other public promotions; and stopped using all of Petland's trade and service marks. He testified that, since then, business had been "maybe a little better," but he was unable to say so with utter certainty.

Since assuming full responsibility for Debtor's management around January 1, 1992, Kaplan has attempted to reduce ongoing business expenses, and has evaluated Debtor's financial position. At present, Debtor is not generating a net operating profit from which debt could be serviced under a plan of reorganization, if it were to continue paying Petland's royalty fees. Kaplan has no proposal for further reducing expenses, augmenting income, or otherwise changing Debtor's cash flow dynamics, so as to generate additional net revenues; nor, apparently, does Debtor have sources of equity capital which would permit any great amount of debt retirement via lump-sum payment. As a result, funds for debt service under a confirmed plan of reorganization would have to come from revenues which are currently subject to Petland's claim for royalty fees, and nowhere else. Debtor lacks the financial resources to propose a plan based on a relocation of operations away from its current location. Such a move would risk the loss of goodwill associated with the current lo-

---

**3.** As a stroll through any enclosed shopping mall or a drive down a "strip" development will reveal, such enforced architectural conformity is a characteristic aspect of the franchise relationship in these days and times.

**4.** Kaplan's testimony on these points is uncontroverted.

**5.** In testimony, Kaplan acknowledged that Petland had no direct fault for any deficiencies in Debtor's operating practices.

cation, however fragile at present; Debtor lacks the funds or access to financing to cover the cost of relocation; and were it to move, it would sacrifice the value of its leasehold improvements, which it cannot recover from its premises landlord.

■ Via the present motion, Debtor both rejects its franchise agreement with Petland pursuant to 11 U.S.C. § 365(a)[6], and seeks the Court's approval of that rejection.[7] As its factual basis, Debtor maintains that the benefits of a continuing franchise relationship with Petland do not justify the cost. Debtor points to several key facts established by the record: the utter lack of operational support it has had from Petland; the prospect that ongoing stigma will be attached to the Petland name as a result of the adverse publicity last fall[8]; and the possibility that Petland, due its own status in bankruptcy, may not be able to carry out its future obligations as franchisor. Given the drain on its own revenues caused by its obligation to pay the royalty fee, Debtor maintains that a continuation of the franchise relationship will thwart any chance of a reorganization under its own control.

In an interesting twist, Petland responds by garbing itself as a guardian of Debtor's estate. On two different bases, it argues that rejection of the franchise agreement is not in the best interests of Debtor's creditors, and will unduly prejudice their chances of financial realization from this case.

First, Petland argues that its franchisees' rights are valuable assets in and of themselves, which parties such as Debtor should not relinquish out of hand.[9] Second—and more to the point—it notes that court approval of the rejection will give rise to a deemed breach of the lease under 11 U.S.C. § 365(g).[10] This breach, it argues, will trigger the covenant of noncompetition in Section 13 of the franchise agreement. As Petland casts it, its subsequent enforcement of the covenant at equity would terminate Debtor's reorganization and destroy the bankruptcy estate: since such enforcement would bar continued operation at the Knollwood Mall, or renewed operation within five miles of it, and since Debtor lacks capital to fund a move from its present location, it would have to close up shop. Liquidation would follow, generating little or no distribution on account of unsecured claims.

■ As a general rule, the courts have required the proponent of a rejection under § 365(a) to satisfy a "business judgment" test. *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 520, 104 S.Ct. 1188, 1193, 79 L.Ed.2d 482 (1984); *In re Huff*, 81 B.R. 531, 537 (Bankr.D.Minn.1988); *In re Briggs Transp. Co.*, 39 B.R. 343, 352 (Bankr. D.Minn.1984). Under the test, the proponent must show that rejecting the contract will benefit the estate; it need not show

6. In pertinent part, this statute provides that "the trustee, subject to the court's approval, may assume or reject any executory contract ... of the debtor." As a debtor in possession under Chapter 11, of course, Debtor has all of the rights and duties of a trustee in bankruptcy. 11 U.S.C. § 1107(a). Neither party disputes that the franchise agreement in question is an executory contract within the ambit of § 365.

7. Under the rule adopted in this Court, the acceptance or rejection of an executory contract or unexpired lease is accomplished via the rejecting party's communication of an unequivocal intent to assume or reject. *In re 1 Potato 2, Inc.*, 58 B.R. 752, 754–755 (Bankr.D.Minn.1986); *In re Re–Trac Corp.*, 59 B.R. 251, 255 (Bankr. D.Minn.1986). This is an act with legal significance completely distinct from the motion for court approval. *In re 1 Potato 2, Inc.*, 58 B.R. at 755. There is no reason why both acts cannot

be accomplished in the text of a single motion, though it is not necessary to do so.

8. The latter point is a rather fatuous dodge of responsibility, given Kaplan's acknowledgement that Petland had nothing to do with the root sources of the negative press, at least "directly."

9. Its counsel argues this point in somewhat lackluster fashion—quite understandably, given the evidence of record.

10. Subject to two nonmaterial exceptions, this statute provides in pertinent part that:
    the rejection of an executory contract ... of the debtor constitutes a breach of such contract ...—
    (1) if such contract ... has not been assumed under [11 U.S.C. § 365] or under a plan confirmed under chapter ... 11 ... of [the Bankruptcy Code], immediately before the date of filing of the [bankruptcy] petition ...

that continued performance would result in an actual loss of value from the estate. *In re Huff,* 81 B.R. at 537. The primary focus of the inquiry should be on the value of the rejection to general unsecured creditors; the interests of other affected parties must be balanced against theirs. *Id.* The test embodies considerable deference to the proponent of the rejection, *id.,* so long as it can articulate sound business reasons for repudiating the contract.

The issue at bar, then, is whether an effective rejection of the franchise agreement would produce a cognizable economic gain for the estate, to the benefit of unsecured creditors. The evidence does establish that Debtor would generate an operating profit, however slim, were it not bound to pay Petland's royalty fees, and that it cannot do so if it is so bound. For some time, Debtor has received nothing of real economic value from its status as franchisee; there is no indication that it would in the future. As the rejection impacts on Debtor's reorganization, then, the difference is between a plan which would provide for some distribution to unsecured creditors, and one which would provide them with much less of a distribution, or none. If considered only from this *operational* aspect, then, the rejection passes the business-judgment test; rejection offers a real chance of financial return to Debtor's unsecured creditors, while continuation of the agreement does not.

The published cases' formulation of the business-judgment test means that its application will usually be a question of fact, turning on the dollars-and-cents considerations just discussed. If the issue is cast as such, a debtor's use of the statute will require the Bankruptcy Court to ascertain the pecuniary gain or loss to be expected from a rejection. Here, however, the economic facts are uncontroverted, and the application of § 365 triggers a question largely legal in nature. As the parties frame it, the basic issue is whether, upon the rejection, the franchise agreement's covenant of noncompetition would bar Debtor from continuing operations at its present location. Because Debtor lacks the financial resources to move, the outcome of this legal question not only controls the present motion, it almost certainly will dictate whether Debtor has any chance of reorganization.[11]

The parties argue the controlling bankruptcy statutes to opposite effect. 11 U.S.C. § 365(g) gives a court-approved rejection of an executory contract the effect of a deemed breach of the contract. Debtor presumes that its rejection relieves it from all duties of performance under the franchise agreement, including those under the covenant of noncompetition, and that Petland has no more rights in consequence of the rejection than the allowance of a claim against the estate. Petland, on the other hand, impliedly argues that the covenant of noncompetition was not subject to rejection—even though it was a part of the integrated agreement which is the subject of Debtor's motion—and that it is entitled

---

11. The totality of the circumstances gives the lie to Petland's pose as a disinterested protector of the interests of Debtor's creditors. Absent relief from its royalty-fee obligations, Debtor cannot make a distribution to unsecured creditors. If Petland has its way on the present motion, then, Debtor could not propose a confirmable plan of reorganization. If it proposed a plan with no distribution to unsecured creditors, that class would be deemed to have rejected the plan. 11 U.S.C. § 1126(g). Upon this deemed rejection, the absolute priority rule of 11 U.S.C. § 1129(b)(2)(B) would raise a substantial hurdle to the confirmation of a plan which preserved pre-petition equity interests. Debtor's chances of a self-directed reorganization, then, would be nonexistent, absent one of two circumstances: a large pre-confirmation increase in net revenues, to enable a distribution to unsecured creditors after all; or, assuming the legal viability of the "new capital" exception to the absolute priority rule, a substantial equity investment—which appears not to be in the offing. (To make things even more uncertain, the predicate legal assumption for the latter is currently a point of controversy in this District, as in many others. *See In re Lumber Exchange Ltd. Partnership,* 125 B.R. 1000 (Bankr.D.Minn.1991), *aff'd,* 134 B.R. 354 (D.Minn.1991), appeal to Eighth Circuit pending.) Under any of these possible scenarios, unsecured creditors would come up short, or empty-handed. By opposing this motion, Petland may be protecting its own generalized interest in its franchising program, and may even be attempting in ham-handed fashion to make an example of Debtor. Contrary to its counsel's blandishments, it is not really watching out for any interest broader than that.

to full equitable enforcement of the covenant.

■ Both parties' analysis on this threshold point is mistaken, though not to pivotal effect. An executory contract is rejected *in its entirety;* a trustee or debtor in possession cannot reject isolated duties under a contract, or component parts of an integrated agreement. *See, e.g., United States Dept. of the Air Force v. Carolina Parachute Corp.,* 907 F.2d 1469, 1472 (4th Cir.1990); *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir.1985); *Lee v. Schweiker,* 739 F.2d 870, 876 (3d Cir.1984); *In re Nitec Paper Corp.,* 43 B.R. 492, 498 (S.D.N.Y.1984); *In re Metro Transp. Co.,* 87 B.R. 338, 342–343 (Bankr.E.D.Pa.1988); *In re David Orgell, Inc.,* 117 B.R. 574, 575–576 (Bankr.C.D.Calif.1990) (all holding that trustee or debtor in possession may not assume only beneficial provisions of integrated contract, and then reject burdensome provisions).[12] Thus, contrary to Petland's unspoken theory, Debtor's rejection encompasses the covenant of noncompetition.

The next step, however, is not as perfunctory as Debtor urges. Section 365(g) does not provide by its terms that every rejection is remedied solely by the allowance of a claim; nor, really, does its companion provision, 11 U.S.C. § 502(g).[13] The wording of § 365(g) is crucial; Congress specifically incorporated the common-law concept of breach of contract into its treatment of contracting parties subjected to rejection. By that incorporation, it clearly implicated a whole body of nonbankruptcy law to govern the fixing of those rights. *See, e.g., In re Re–Trac Corp.,* 59 B.R. at 259 (rights of parties to lease or contract subjected to § 365 are governed by state law, to extent state law does not contravene the Bankruptcy Code). This principle also is embodied in the structure of the Code itself. The statute defines the time as of which a rejection of an executory contract constitutes such a breach, H.REP. No. 595, 95th Cong., 1st Sess. 349 (1977) and S.REP. No. 989, 95th Cong., 2d Sess. 60 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787, and fixes the date as the time immediately before the debtor's bankruptcy filing. The purpose of going back to this point "is to treat rejection claims as pre-petition claims." *Id.*

■ State law, then, must govern the parties' rights in consequence of a deemed breach under § 365(g)—not the least because those rights are deemed to have arisen *before* federal bankruptcy law overlay the pre-petition legal configuration. State law—not federal bankruptcy law—identifies the remedies which the non-rejecting party has upon the deemed breach, and dictates the relief that the Bankruptcy Court must accord to the non-rejecting party.[14]

---

**12.** Interestingly, most, if not all, of the reported decisions use this principle to deny the attempt of a rejecting trustee or debtor to have it both ways. The obverse of the proposition, of course, is that the opposing party cannot have it both ways either.

**13.** In pertinent part, this statute provides:

A claim arising from the rejection, under [11 U.S.C. §] 365 ... of an executory contract ... of the debtor that has not been assumed shall be determined, and shall be allowed ... or disallowed ..., the same as if such claim had arisen before the date of filing of the [bankruptcy] petition.

This language only delimits claims which arise from rejections under § 365; it says nothing about the availability of other remedies to the non-debtor party, or the ability of such a party to invoke those remedies against a debtor or trustee in bankruptcy.

**14.** Many courts have published decisions treating the status of covenants of noncompetition upon rejection under § 365. Few of them, however, seem to have recognized the governance of state law upon rejection, or the need under that law to address the competing equities in a thoroughgoing way. (At least one court has explicitly rejected state-law governance, apparently on the time-worn notion that some undefined federal common law should govern just because the debtor is in a federal court. *See In re JRT, Inc.,* 121 B.R. 314 (Bankr.W.D.Mich.1990).) Some courts have perfunctorily concluded that the non-rejecting party is relegated to filing a claim for damages, and participating in the estate on the basis of that claim as ultimately allowed. *See, e.g., In re Register,* 95 B.R. 73 (Bankr.M.D.Tenn.1989), *aff'd,* 100 B.R. 360 (M.D.Tenn.1989); *In re Allain,* 59 B.R. 107 (Bankr.W.D.La.1986); *In re Norquist,* 43 B.R. 224 (Bankr.E.D.Wash.1984); *In re Rovine Corp.,* 6 B.R. 661 (Bankr.W.D.Tenn.1980). Just as perfunctorily, others have granted equitable relief against the debtor—implicitly concluding, with

Here, the parties' agreement specifies the governing law as being that of Ohio.[15] The question, then, becomes: what are the consequences under Ohio law, at law and/or at equity, of a breach of a covenant of noncompetition? To what remedies is the protected party entitled, and what deference, if any, must the Court give to the party which gave the covenant and now wishes to renege? Most pointedly—given Petland's assertions—is the protected party absolutely entitled to an injunction against the competing business activity, and, if not, what must it show to obtain one?

Luckily, the Ohio courts have addressed these issues frequently, with thoughtfulness and in some detail. They have developed a two-part test to determine whether a covenant of noncompetition should be enforced by injunction.

First, it must be determined whether the covenant is valid. To do so, "each case must be decided on its own facts...." *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544, 547 (1975) (citing *Extine v. Williamson Midwest*, 176 Ohio St. 403, 200 N.E.2d 297 (1964)). Prior to *Raimonde*, Ohio courts called upon to enjoin

business activity alleged to be in violation of covenants of noncompetition had applied the so-called "blue pencil" rule. *See Extine v. Williamson Midwest; Briggs v. Butler*, 140 Ohio St. 499, 45 N.E.2d 757 (1942). Under this rule, restrictive covenants in employment contracts were to be separated, to the extent possible, and examined for "reasonableness." *Raimonde*, 325 N.E.2d at 546. The court then was to enforce all "reasonable," divisible restrictions; to decline to enforce "unreasonable" ones; and to strike down entire contracts if the covenants could not be divided, and an unreasonable covenant tainted the contract. *Id.* Re-examining the "blue pencil" doctrine, and concluding that it led to "arbitrary and inconsistent results,"[16] the *Raimonde* court held that a covenant of noncompetition will be enforced at equity only to the extent reasonably necessary to protect the protected party's legitimate interest. 325 N.E.2d at 547. Under *Raimonde*, a covenant of noncompetition is reasonable "if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Id.*[17] Thus,

---

little or no discussion, that an injunction was the primary and favored remedy upon the debtor's deemed breach. *See, e.g., In re Don & Lin Trucking Co., Inc.*, 110 B.R. 562 (Bankr.N.D.Ala. 1990); *In re Noco, Inc.*, 76 B.R. 839 (Bankr. N.D.Fla.1987); *In re Carrere*, 64 B.R. 156 (Bankr.C.D.Calif.1986). At least one has concluded, again without discussion of state law, that *both* remedies are available to the non-rejecting party. *In re Thomas*, 133 B.R. 92 (Bankr.N.D.Ohio 1990). Only one of these courts—the District Court ruling on the appeal in *In re Register*—properly recognized the governance of nonbankruptcy principles of equity, and applied those precepts to the evidentiary record before it. *See* 100 B.R. at 362–363.

15. Section 24 of the Franchise Agreement provides:

This agreement has been drawn and will be executed, in part, in the State of Ohio. All questions concerning the meaning, intention, or validity of this agreement and all questions relating to performance hereunder shall be judged and resolved in accordance with the laws of that State.

16. In support of the argument that an injunction must lie in Petland's favor under Ohio law, its counsel cited only one case: *Briggs v. Butler*. Strictly speaking, *Briggs v. Butler* has not been

"overruled"; however, the *Raimonde* court clearly rejected its "blue pencil" test. Petland's counsel either failed to investigate the legal bases for their argument so as to uncover the major caselaw development since *Briggs v. Butler*, or did not disclose the existence of known, potentially-adverse authority. Either possibility is equally troubling.

17. The *Raimonde* court noted a number of factors which bear on these three elements:

[t]he absence or presence of limitations as to time and space, ... whether the employee represents the sole contact with the customer; whether the employee is possessed with confidential information or trade secrets; whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition; whether the covenant seeks to stifle the inherent skill and experience of the employee; whether the benefit to the employer is disproportional to the detriment of the employee, whether the covenant operates as a bar to the employee's sole means of support; whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment; and whether the forbidden employment is merely incidental to the main employment.

courts are empowered to modify or amend employment agreements to achieve such "reasonable" results. *Id.*

The protected party seeking an injunction must produce clear and convincing evidence of the three elements of reasonableness. In addition it is "required to establish *actual irreparable harm* where the equitable remedy of injunction is sought." *Miller Medical Sales, Inc. v. Worstell,* 1992 WL 31988, *3, 1992 Ohio App. LEXIS 779 (Ohio Ct.App.1992) (emphasis added). *See also Levine v. Beckman,* 48 Ohio App.3d 24, 548 N.E.2d 267, 270–71 (1988). *See also Arthur Murray Dance Studios of Cleveland v. Witter,* 105 N.E.2d 685, 701–712 (Ohio Ct.C.P.1952) (extensive discussion of irreparable injury in context of request for injunction to enforce covenant of non-competition).

Actual irreparable injury is usually not presumed, but instead must be proved. *Levine v. Beckman,* 548 N.E.2d at 271. The *Arthur Murray* court acknowledged that irreparable injury is very difficult to define. It did, however, accept the definition of irreparable injury as stated in its contemporary edition of AM.JUR.:

> ... [t]o be irreparable, the injury need not be beyond the possibility of repair or beyond possible compensation in damages, nor need it be very great. The term "irreparable damage" does not have reference to the amount of damage caused, but rather to the difficulty of measuring the amount of damages inflicted.

105 N.E.2d at 703 (citing to 28 AM.JUR. at 243–245 (edition and year of publication not indicated)). The *Arthur Murray* court also found that though the difficulty of *measuring damages* may suggest that an injury is irreparable, the "[m]ere difficulty of *proving the injury* ... does not automatically mean irreparable injury has occurred." *Arthur Murray,* 105 N.E.2d at 703 (emphasis added). The obverse of this proposition, of course, is that where there is

325 N.E.2d at 547 (citations omitted).

18. Because this point is dispositive, the Court need not reach the issue of the reasonableness

a full, complete, and adequate remedy in a court of law, for an injury, it is not irreparable; and if full compensation can be obtained by damages in an action in that form, equity will not apply the *extraordinary remedy* by [sic] injunction.

*Id.* at 702 (quoting 28 AM.JUR. at 243–245).

■ Once Debtor made its *prima facie* case under the business judgment test, Petland had the burden to prove up the predicates of its objection. The central such predicate was the financial disaster which Petland alleges would follow, once it enforced its contractual rights after the rejection. As the proponent of the injunction which it asserted as its main remedy, then, Petland had the burden to prove up its right to such relief in the context of this motion. It clearly failed to do so, on the second element—irreparable injury.[18]

Under the franchise agreement, Petland's direct contractual benefit consisted of its right to royalty fees from Debtor, and the opportunity to sell products to Debtor as a supplier. Its indirect benefit, of course, lay in the promotion of goodwill for its business identity, as generated by the cumulation of successful franchises' operations. Its benefits from the agreement's negative covenants were less obvious; however, they clearly included the protection of such things as its trade secrets, its distinctive operational formats and practices, customer goodwill, and the value of management continuity and stability at established franchised locations.

Loss of the royalty income is the most obvious and direct consequence of a rejection of the franchise agreement. Under Ohio law, this, standing alone, does not constitute irreparable harm. Although the damages resulting from the cessation of payment may be difficult to estimate, they would not be impossible to prove. Other than this, the record proves up no other possibility of direct pecuniary loss. Petland cannot credibly complain that it would

of the negative covenant. Neither party even recognized this as an issue, let alone made a record on it.

lose wholesaling business, as Debtor is not required to purchase inventory and supplies from Petland. Even if Debtor's past voluntary purchases were of a level sufficient to merit consideration and redress for a loss of future wholesaling patronage, the amount of the resultant damages certainly can be ascertained, and the injury is not irreparable.

The negative covenants protecting Petland's more abstruse interests might require a more involved discussion, were the record to merit it. It does not. Petland declined to present any evidence on this motion, though it had ample opportunity to do so. It has not proved that its formats and programs included any unique element, or any special trade secret capable of unfair exploitation in the hands of a breaching franchisee. Debtor is not using Petland's trade and service marks, or a store layout which it prescribes or suggests. Petland had not even shown that repeat customer business is a major factor in its franchisees' income generation, let alone that customer goodwill, general or specific, may be usurped unfairly by Debtor. While Petland's management programs may have been of some initial benefit to Debtor in its early years of operation, there is no showing that Kaplan has developed unique expertise at Petland's expense, or that he would use it to draw business away from a successor franchisee. There simply is no evidence that Petland would suffer irreparable harm to the more intangible interests protected under its franchise agreement, were Debtor not enjoined from continuing a non-franchised operation at its present location.

While not addressing the legal standards for injunctive relief under Ohio law, Petland argues that it "has no alternative right to monetary damages" and that injunctive relief is its *only remedy.* This argument is without merit.[19] As noted earlier at pp. 758–59, the precept of earlier Ohio law that injunction was a favored remedy in cases like this has been supplanted by a new rule, one more cognizant of franchisees' rights to continue their busi-

nesses by using their own abilities and business acumen. In any event, even under general principles of equity, the granting of injunctive relief is not a "strict right." *See Arthur Murray Dance Studios,* 105 N.E.2d at 694; *OGIA/Rogers Agency, Inc. v. Estep,* 1990 WL 174100, 1990 Ohio App. LEXIS 4908 (Ohio Ct.App.1990). Rather, it is an equitable remedy that is to be used sparingly. As evidenced by the development of the governing standard from *Briggs,* through *Raimonde,* to *Miller Medical Sales,* the Ohio courts have been increasingly disinclined to grant broad injunctive relief against parties in breach of covenants of noncompetition. One general pronouncement, however, persists throughout the cases: the granting of an injunction "rests in the sound—not the arbitrary—discretion of the court." *Arthur Murray Dance Studios of Cleveland v. Witter,* 105 N.E.2d at 694. Moreover, "[a]llowance is *not* a matter of strict right." *Id.* (emphasis added). *See also Perkins v. Village of Quaker City,* 165 Ohio St. 120, 133 N.E.2d 595 (1956) ("Injunctions are an extraordinary remedy equitable in nature and their issuance may not be demanded as a matter of right."); *OGIA–Rogers Agency, Inc.,* 1990 WL 174100, 1990 Ohio App. LEXIS 4908. Where the proponent of such injunctive relief has not even met its own burden of proof, the court obviously cannot exercise its discretion in favor of that party.

In objecting to Debtor's motion, Petland asserted that the legal consequences of an effective rejection would be too onerous for the estate to bear. These consequences, of course, are fixed by nonbankruptcy law, and are those which would have ensued had Debtor breached the franchise agreement outside bankruptcy. Once Debtor met its own initial burden under § 365, Petland had the burden as objector to show that the alleged consequences would follow. Though the consequences were legal, their inevitability was largely a matter controlled by underlying facts—the existence of grounds for the according of the eq-

---

**19.** Petland cites no authority to support this proposition. Rather, Petland merely cites Con-

gressional floor remarks.

uitable relief alleged by Petland to have been its, as of right. Petland did not carry this burden; it failed to produce the evidence of irreparable harm predicate to its right to an injunction. The sparse evidence of record supports the conclusion that a full and adequate remedy at law for Debtor's deemed breach is available to Petland—the allowance of a claim for its actual damages consequent to the breach. Debtor having met its own burden under § 365 without viable rebuttal by Petland, then,

IT IS HEREBY ORDERED that Debtor's rejection of its executory franchise agreement with Petland, Inc. is approved.