In re **INDEPENDENT AMERICAN REAL ESTATE, INC.,** Debtor.

**Bankruptcy No. 386–33319 RCM–7.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

July 8, 1992.

Todd R. Moore, Dallas, Tex., for MexTex.

Frederick W.H. Carter, Dallas, Tex., for trustee.

## MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

The following are the Court's Findings of Fact and Conclusions of Law under Bankruptcy Rule 7052 with respect to the May 11, 1992 trial on the Trustee's objections to the claims of MexTex Realty Company, Inc. ("MexTex"). MexTex's claims arise from the Debtor's rejection of executory contracts and its non-payment of a promissory note. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a), (b), and (d), and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

This proceeding involves the characterization of contracts relating to the Debtor's joint development of ten shopping centers with MexTex. Initially, this Court must determine whether the various contracts relating to each shopping center site were intended by the parties to constitute one integrated agreement. This issue is significant because, to the extent the agreements are required to be interpreted together, violations of the comprehensive development agreement, known as the Easements,

Covenants and Restrictions Agreement ("ECR"), would trigger the liquidated damages provisions contained in a separate document. Allowance of MexTex's claim, in the amount sought, is predicated upon the Court determining the construction agreements form an integrated contract, executory in nature.

The Trustee does not dispute the executory nature of the construction agreements; however, he has challenged the appropriateness of using the liquidated damages provision as the measure of damages for the rejected executory contracts. Specifically, the Trustee has challenged the enforceability of the liquidated damages clause under state law, on the grounds that it constitutes a penalty. In addition, he asserts the agreements are severable. Finally, the Trustee challenges the right of MexTex to assert a claim for attorney fees on an undersecured claim, a promissory note.

### Factual Background

On September 4, 1986, Independent American Real Estate, Inc. ("IARE" or the "Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Effective October 26, 1987, IARE's Chapter 11 case was converted to a case under Chapter 7.

On September 11, 1988, Michael W. Anglin was appointed substitute Trustee to succeed Timothy J. Vineyard as Trustee for IARE.

MexTex is a subsidiary of the corporation which owns the Furr's chain of grocery stores. Between 1985–1986, MexTex and IARE-related partnerships entered into agreements to develop shopping centers in west Texas and New Mexico. IARE and its affiliate, Independent American Financial Services, Inc. ("IAFS"), were the general partners in each of the IARE-related partnerships. The transactions were typically structured that IARE-related partnerships purchased construction sites from MexTex. The partnerships were then to develop a strip shopping center adjacent to a Furr's supermarket facility to be constructed by MexTex.

Although MexTex sold the construction sites for cash, in addition, MexTex negotiated a profits participation interest to be paid upon the disposition of the shopping centers. The document which granted that right is known as the Net Profits Interest Agreement (the "NPI Agreement"). (Plaintiff's Exhibits ("PXs") 2, 4, 6, 8, 10, 11, 12, 13, and 16). This additional consideration was provided MexTex in recognition of the value contributed to the properties by the presence of an anchor tenant, the Furr's grocery store.

In addition to having a right to a portion of the proceeds realized upon disposition of the shopping centers under the NPI Agreements, MexTex and IARE entered into additional agreements known as the Put Agreements. Under the terms of the Put Agreements, MexTex, upon written demand, could require IARE to buy its profit interest for a fixed amount.

The Put Agreements were only exercisable under certain conditions. In the case of five of the transactions which form the basis of MexTex's claims, the Put Agreements could only be exercised between dates ranging from April 1, 1986 through December 31, 1986. (PXs 7 and 9). In five other instances, the Put Agreements could be exercised within a 120–day window, upon the project's completion. (PXs 1, 3, 5, and 14–15).

Each Put Agreement did, however, provide a liquidated damages clause. That provision was exercisable at MexTex's option, by filing suit for specific performance, if IARE did not honor its agreements and covenants contained in the NPI and Put Agreements.

Contemporaneous with their execution of the above agreements, the parties entered into a comprehensive development agreement, entitled "Easements, Covenants, and Restrictions Agreement" ("ECR") (collectively, the Put, NPI and ECR Agreements are referred to as the "Construction Agreements"). The ECRs established a timetable for the completion of the shopping centers and their common area. In addition,

they set forth the parties' mutual obligations and responsibilities. (PX 28).

On one occasion, MexTex assisted in financing the purchase of a site located at Tascosa Road in Amarillo, Texas. IARE executed a note to MexTex for the balance of the property's purchase price, $789,611.40 (the "Note"), and MexTex received a second deed of trust lien on the property to secure the Note's repayment. As of the date of the filing of IARE's bankruptcy case, IARE had defaulted under the terms of the Note and the Note had been accelerated.

As of that same date, the IARE-related partnerships had completed construction of only two of the shopping centers: (i) the shopping center located in El Paso, Texas (Sunset); and (ii) the shopping center in Lubbock, Texas (Candle Creek). The other eight shopping centers were in various phases of completion.[1]

Post-petition, IARE rejected the agreements it had with MexTex relating to the ten construction projects. As a result of the post-petition rejection of the agreements, MexTex has allegedly suffered damages totalling in excess of $2.8 million. MexTex timely filed two claims: claim 169 in the amount of $2,160,520.07, and its amended claim, 1,029, in the estimated amount of $2,852,110.59. The claims are based on breach of contract, rejection of executory contract, and non-payment of the Note. Appendix "A" summarizes the transactions of the parties.[2]

### Discussion
### Construction Agreements Form One Indivisible Contract

■ A bankruptcy analysis of the Construction Agreements under § 365 involves a two-step process. State substantive law is looked to in order to define the nature

and extent of the Debtor's property rights existing as of the petition date. To the extent there are viable rights as of the filing date, federal bankruptcy law governs their exercise. *In re Cochise Park, Inc.,* 703 F.2d 1339 (9th Cir.1983); *In re Terrell,* 892 F.2d 469 (6th Cir.1989). The issue of whether the parties intended a contract to be entire or severable is governed by state law. *In the Matter of Wall Tire Distributors, Inc.,* 110 B.R. 614 (Bankr.M.D.Ga. 1990).

Under general rules of contract construction, absent ambiguity, the intent of the parties in forming a contract is gleaned from the four corners of the instrument itself. *Official Creditors Committee of Stratford of Texas v. Stratford of Texas, Inc.,* 635 F.2d 365 (5th Cir.1981). Three aspects of the Agreements provide persuasive evidence of the parties' intent: (i) the nature and purpose of the Agreements; (ii) the divisibility of the consideration supporting each agreement; and (iii) the interrelatedness of the obligations of each party to the Agreements. *In the Matter of Wall Tire Distributors, supra* at 617 (citing *In re Gardinier, Inc.,* 831 F.2d 974, 976 (11th Cir.1987), *cert. denied* 488 U.S. 853, 109 S.Ct. 140, 102 L.Ed.2d 112 (1988)).

Various Bankruptcy Courts have recognized the general rule of construction which provides that instruments that are conditionally dependent upon one another are to be read and interpreted as one agreement. *In the Matter of Wall Tire Distributors, Inc., supra* at 617 (asset lease and purchase agreement was indivisible contract for purchase of business, although business was to be transferred in stages); *In re Rachels Industries, Inc.,* 109 B.R. 797, 803 (Bankr.W.D.Tenn.1990); *In the Matter of East Hampton Sand and Gravel Co., Inc.,* 25 B.R. 193 (Bankr. E.D.N.Y.1982) (lease of concrete plant and

---

1. On five properties, the Furr's grocery store had been completed, but no other construction had been begun: Amarillo, Texas (Arden Bell); Amarillo, Texas (Tascosa Row); Albuquerque, New Mexico (Plaza del Prado); Canyon, Texas (University Plaza); and Vernon, Texas (Vernon Plaza).

    On three properties, the Furr's grocery store was in place and construction of the adjoining

strip shopping center was underway: Hereford, Texas (Northgate); Abilene, Texas (Woodhaven); and Portales, New Mexico.

2. Appendix "A", attached hereto, is a summary prepared by the Court from PXs 22 and 28, as modified by the testimony of James Pleasant.

promissory note interpreted together since both documents arose out of same transaction [sale of concrete business] and were conditionally dependent upon each other); *In the Matter of T & H Diner, Inc.*, 108 B.R. 448 (D.N.J.1989) (citing *East Hampton Sand* approvingly, lease and promissory note interpreted together since each was integral to a single transaction, the sale of a restaurant); *In re OK–KWI Lynn Candles, Inc.*, 75 B.R. 97 (Bankr.N.D.Ohio 1987) (where a lease incorporated a franchise agreement, court held compliance with the terms of the franchise agreement and adequate assurance of future performance of same must be shown before assumption of the lease could occur).

The overlap between the terms of the Construction Agreements strongly suggests that the agreements are to be read as one instrument. The Construction Agreements were executed at substantially the same time, by the same parties,[3] and refer to the same subject matter, the development of shopping centers.

The clear language in the Put and NPI Agreements reflect that the granting of a profits interest to MexTex formed a large part of the consideration given in exchange for MexTex's land sale and grant of a license to the Debtor to develop shopping centers on the sites.

The Put Agreements uniformly state:

As an integral part of the aforesaid land purchase[s] by the Partnership from Mex/Tex, Mex/Tex was granted a net profits interest in and to the general partnership interests owned by Real Estate [IARE] and Financial Services [IAFS] in the Partnership.

In turn, the right to require IARE to repurchase the profits interest constituted a necessary part of the consideration paid Mex-Tex as part of the overall agreement.[4]

The interrelatedness of the contract provisions contained in the Construction Agreements strongly suggests that violation of the construction deadlines in the ECRs in turn violated the terms of the Put and NPI Agreements. MexTex's representative testified that completion of the shopping center's construction within the timetable established in the ECRs was critical—Furr's supermarket facilities were reliant upon the contiguous shopping centers to attract customers to the sites. The provisions of the NPI and Put Agreements reflect that timely completion of the shopping centers was a central concern. IARE specifically covenanted in the NPI Agreements

---

**3.** The Trustee has raised the argument that IARE is not bound by the ECRs in question, because it was not a party to those agreements. The Trustee argues that only the partnerships, signatories to the agreements, were bound by the ECRs, not IARE, the general partner. This position is clearly without merit and is in contravention of Texas law. The general partner in each of the partnerships with which MexTex contracted, is directly and personally liable for any and all breaches of the ECRs by the partnerships.

It is well-settled in Texas that a general partner of a limited partnership is also personally liable for the limited partnership's debts and obligations. *See Northwest Otolaryngology Associates v. Mobilease, Inc.*, 786 S.W.2d 399 (Tex. App.—Texarkana 1990, writ denied); *Sunbelt Service Corporation v. Vandenburg*, 774 S.W.2d 815, 817 (Tex.App.—El Paso 1989, writ denied) (general partners of a limited partnership are personally liable to creditors for the limited partnership's debts); *Shindler v. Marr & Associates*, 695 S.W.2d 699, 702 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.) (holding that, in a limited partnership, general partners are personally liable to creditors); *Rohdie v. Wash-*

ington, 641 S.W.2d 317 (Tex.App.—El Paso 1982, writ ref'd n.r.e.) (the general partner of a limited partnership is personally liable for the partnership's debts); *Hawn v. Hawn*, 574 S.W.2d 883 (Tex.Civ.App.—Eastland 1978, writ ref'd n.r.e.) (general partners of limited partnership are jointly and severally liable). *See also*, Tex. Rev.Civ.Stats.Ann. 6132a, § 10(a) ("A general partner shall have ... liabilities of a partner in a partnership without limited partners ..."); 6132b, § 15 ("All partners are liable jointly and severally for all debts and obligations of the partnership...."); *Foster v. Daon Corp.*, 713 F.2d 148 (5th Cir.1983).

**4.** The third paragraph of the Put Agreement states:

As a material inducement for Mex/Tex to agree to the terms and conditions of the [NPI] Agreement, Real Estate [IARE] and Financial Services have agreed that, upon request of Mex/Tex, Real Estate and Financial Services [IAFS] shall purchase and acquire for cash the contractual rights and benefits of Mex/Tex in, to and under the net profits interest owned by Mex/Tex under the Agreement as more fully set forth in this letter.

"not [to] take any action or not fail to take any action, if such taking or failure to take would cause the Contiguous Property to materially decrease in value". *See,* § 4.01(a). Recognizing that the value of the profits interest was uncertain, and dependent upon completion of the shopping centers, the Put Agreements addressed the issue of default under the Construction Agreements by providing MexTex with a remedy, liquidated damages in a fixed amount. The liquidated damages provision was exercisable at MexTex's option if IARE breached the Construction Agreements. Through these provisions, the NPI and Put Agreements incorporate the completion deadlines and mutual covenants to complete the shopping centers established in the ECRs.[5]

### Construction Agreements are Executory in Nature

■ Having determined under contract law that the Construction Agreements for each site form one indivisible agreement, federal bankruptcy law governs whether that agreement is executory in character.

■ An executory contract is defined generally as a contract under which the parties' obligations are so far unperformed that the failure of either to complete their performance constitutes a material breach excusing performance of the debtor. Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439, 460 (1973); *In re Placid Oil Co.,* 72 B.R. 135 (Bankr.N.D.Tex.1987).

■ The reciprocal nature of the obligations stated in the ECRs places them within the definition of an executory contract. Specifically, the ECRs impose mutual ongoing obligations on MexTex and the Debtor. After selling IARE fee simple title to a portion of the site for construction of the strip shopping center, MexTex re-

mained obligated to build the supermarket adjacent thereto. In addition, it granted IARE temporary licenses to enter upon its respective parcel for access to the site, and storage while construction work was underway. Further, beyond completion of the construction, each party promised to grant the other easements for parking, use of roadways and walkways. Most significantly, both parties agreed on an ongoing basis to enforce use restrictions with respect to all of the shopping center. As of the date of the filing of IARE's bankruptcy case, though MexTex had performed its duties to complete the supermarket facility on the sites, significant obligations remained unperformed. The fact that some of those obligations were contingent in nature, is not material. *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043 (4th Cir.1985) *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *In re Hardie,* 100 B.R. 284 (Bankr.E.D.N.C.1989). For the purposes of determining whether a contract is an executory contract, a court would presume that the debtor's contingent obligation would be performed. *In re Hardie, supra.*

Because the ECRs contemplate substantial continuing duties, binding both MexTex and IARE, and because the failure of either party to perform would normally be deemed a material breach, the Construction Agreements are executory contracts.

■ The Chapter 7 Trustee, having taken no action to assume these executory contracts, is deemed to have rejected them. 11 U.S.C. 365(d)(1). The rejection of the Construction Agreements, however, does not leave MexTex without any remedy. Under the Bankruptcy Code, a rejection gives rise to a legal fiction that a breach of the contract occurred immediately prior to the filing of the petition. 11 U.S.C. § 365(g)(1). 3 *Collier on Bankruptcy*

---

5. Three provisions of the ECR govern completion. The first provision is § 2.4 which requires the partnerships to complete work related to the shopping center, such as landscaping, parking lot improvements, etc. (defined in the ECRs as the "Work") by a certain date. The second group of controlling provisions are §§ 5.3 and 5.4 of the ECR. These sections dictate when the IARE–related partnership must complete its part of the shopping center structure. Each

ECR establishes a grand opening date by which the partnership was to have substantially completed its work. Those grand opening dates range from April 1, 1986 to September 1, 1987. Sections 6.3 and 6.4 of the ECR are linked to §§ 5.3 and 5.4, and those provisions obligate MexTex to complete its construction of the grocery stores to be located adjacent to the shopping center by a certain date.

¶ 502.07 (15th ed. 1992); *Lindermuth v. Myers*, 84 B.R. 164 (D.S.D.1988); *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). Thus, a claim is allowable for those damages resulting from the breach, and the Court will determine the amount and validity of the claim as of the date of the breach. 11 U.S.C. §§ 101(4)(a–b), 365(g), 502, and 502(g).

■■■ In making the determination under § 502 as to the extent of the claim to be allowed, the Court must go beyond the Bankruptcy Code to the substantive state law governing the rejected contract. *Lindermuth, supra* at 166. State law specifies the remedies of a non-breaching party to a contract when the contract is breached, to the extent state law does not contravene the Bankruptcy Code. *Lindermuth, id.; In re Re–Trac Corp.*, 59 B.R. 251 (Bankr.D.Minn.1986); *In re Audra–John Corp.*, 140 B.R. 752 (Bankr.D.Minn.1992).[6]

### Liquidated Damages Constitute the Proper Measure of Damages Upon Rejection of Construction Agreement

■■■ MexTex has sought to recover damages resulting from the rejection of the

Construction Agreements based on the liquidated damages provisions contained in the Put Agreements. Allowance of its claim, in large part, turns on whether the liquidated damages provision is enforceable under state law. Under Texas law, a liquidated damages provision will be enforced when the Court finds that (i) the harm caused by the breach is incapable or difficult of estimation; and (ii) the amount of liquidated damages is a reasonable forecast of just compensation. *Advanced Tank & Const. Co. v. City of DeSoto*, 737 F.Supp. 383 (N.D.Tex.1990). The party asserting a liquidated damages clause is in fact a penalty provision has the burden of proof. *Commercial Union Ins. Co. v. La Villa Indep. School Dist.*, 779 S.W.2d 102 (Tex. App.—Corpus Christi 1989, no writ); *Baker v. Int'l. Record Syndicate, Inc.*, 812 S.W.2d 53 (Tex.App.—Dallas 1991, no writ). Evidence related to the difficulty of estimation and the reasonable forecast must be viewed as of the time the contract was executed. *Baker, supra* at 55.

■■■ The MexTex representative testified that, because fair market rental value

**6.** Two courts have held that rejection of an executory contract containing a liquidated damages clause results in the rejection of the liquidated damages clause itself, on the principle that an executory contract may be assumed in whole and not in part, and that that principle is applied to rejection. *In re TransAmerican Natural Gas Corp.*, 79 B.R. 663 (Bankr.S.D.Tex.1987); *In re El Intern.*, 123 B.R. 64 (Bankr.D.Idaho 1991). This Court disagrees that enforcement of a liquidated damages clause contained in a rejected executory contract contravenes the Bankruptcy Code, and respectfully declines to follow those cases. *Cf., In re Davies*, 27 B.R. 898 (Bankr.E.D.N.Y.1983); *In re Lindermuth, supra.* The principle of requiring a debtor to assume an executory contract in its entirety exists to protect creditors, *i.e.*, to prevent debtors from reaping the benefits of a contract by assuming its favorable features, while rejecting its unfavorable ones. It is inequitable, to say the least, to deny a creditor remedies permitted under state law, when the very wording of the Code implicates state law in defining the rights of a creditor to a rejected executory contract, and no provision of the Code provides otherwise.

*In re Audra–John Corp., supra,* succinctly recognizes state law's governance regarding remedies applicable to rejected contracts:

The wording of § 365(g) is crucial; Congress specifically incorporated the common-law concept of breach of contract into its treatment of contracting parties subjected to rejection. By that incorporation, it clearly implicated a whole body of nonbankruptcy law to govern the fixing of those rights.... This principle also is embodied in the structure of the Code itself. The statute defines the time as of which a rejection of an executory contract constitutes such a breach, H.REP. No. 595, 95th Cong., 1st Sess. 349 (1977) and S.REP. No. 989, 95th Cong., 2d Sess. 60 (1978), and fixes the date as the time immediately before the debtor's bankruptcy filing. The purpose of going back to this point 'is to treat rejection claims as pre-petition claims.' Id. *5 State law, then, must govern the parties' rights in consequence of a deemed breach under § 365(g)—not the least because those rights are deemed to have arisen before federal bankruptcy law overlay the pre-petition legal configuration. State law—not federal bankruptcy law—identifies the remedies which the non-rejecting party has upon the deemed breach, and dictates the relief that the Bankruptcy Court must accord to the non-rejecting party.
*In re Audra–John Corp., supra* 140 B.R. at 757. [Footnote omitted].

of the proposed shopping centers was difficult to assess at the formation of the Construction Agreements, the parties negotiated a liquidated damages provision. MexTex attributed varying amounts of liquidated damages to each project according to the size of the project.

In the Put Agreements themselves, the parties acknowledged that the profit interest held by MexTex in each of the shopping centers could not be readily sold or assigned by MexTex. In addition, they acknowledged that MexTex would be irreparably harmed if the Debtor failed to meet its obligations under the Construction Agreements. In view of the inherent difficulty in valuing either the profit interest, or the fair market rental value of the projects at the formation of the Construction Agreements, the Court finds the amounts fixed in the Put Agreements were not unreasonable as to MexTex's actual damages.

▮ Though it was not MexTex's burden to show the liquidated damages were not disproportionate to the actual damages suffered, it in fact did so. In at least two to three instances, MexTex was forced to complete construction of shopping centers at a cost of several million dollars in order to obtain certificates of occupancy, necessary to open its supermarket facilities. Additionally, Furr's was required to close its Abilene, Texas, store because of the Debt-

or's failure to build out and lease up the property. Based on that testimony, the Court cannot say that the amount of liquidated damages charged was grossly excessive.

Initially, the Trustee overcame the *prima facie* case established by MexTex's proofs of claim, with testimony from a business records custodian that the Debtor's business records did not reflect any liabilities owing to MexTex. MexTex, however, brought forth additional evidence to prove the validity of its claim by a preponderance of the evidence, and established that its claim for liquidated damages was enforceable. Bankruptcy Rule 3001(f); *In re Fidelity Holding Company, Ltd.*, 837 F.2d 696, 698 (5th Cir.1988); Russell, *Bankruptcy Evidence Manual*, § 301.38 at 142–143 (West 1991).

▮ The burden of proving that the liquidated damages was a penalty was upon the Trustee. The Trustee failed to adduce any evidence that MexTex's actual damages were not an approximation of the stipulated sum. *Baker, supra* at 55. Based on the Trustee's failure to establish that the liquidated damages clause was in actuality a penalty, the Court concludes that MexTex is entitled to an allowed claim on the eight uncompleted projects, totalling $1,375,000.[7]

7. The Lubbock and El Paso, Texas properties, completed prior to the IARE bankruptcy, are subject to a different executory contract analysis since they were fully completed prior to the bankruptcy. A claim based on those Construction Agreements, to the extent allowable, is dependent upon whether the option portion of the Put Agreements had been extinguished through MexTex's inaction. Analyzed independently, the Put Agreement constitutes an option contract, executory in nature. *In re G–N Partners*, 48 B.R. 462 (Bankr.D.Minn.1985); *In re Hardie, supra; In re Mellen*, 79 B.R. 385 (Bankr.N.D.Ill. 1987); *In re Le Chateau McKinney, Inc.*, 5 Tex. Bankr.Ct.Rep. 430 (Bankr.N.D.Tex.1991).

Under Texas law, an option is a continuing offer to acquire property within a specified period of time. The contract does not bind the holder of the option to do anything. The holder may accept or reject the offer as he chooses, within the time specified. If the option is not accepted within that time, the right to do so is lost. *Northside Lumber & Building Company v. Neal*, 23 S.W.2d 858 (Tex.Civ.App.—Fort Worth

1929, no writ); *McWhirter v. Morrow*, 203 S.W.2d 317 (Tex.Civ.App.—Amarillo 1947, no writ); *Kenver Corp. v. Robinson*, 492 S.W.2d 317 (Tex.Civ.App.—Beaumont 1973, writ ref'd n.r.e.).

The Put Agreement contains language suggestive of an option contract. Under its terms, IARE was obligated to repurchase MexTex's profit interest upon the occurrence of one of two conditions: (i) completion of the project; or (ii) exercise of the Put between August 31, 1986 and December 31, 1986. Under the terms of the contract, MexTex may or may not exercise the option as it chooses. If, through inaction, the option remained unexercised, eventually the Debtor would be relieved of its duty to perform under the Agreement.

Under the Put Agreement relating to the Lubbock property, MexTex was required to exercise the option between August 31, 1986 and December 31, 1986. Time for performing the option had not expired as of the date of IARE's bankruptcy filing. As of that time, IARE owed MexTex a continuing duty to purchase the profits

## Attorneys' Fees are Allowable on an Undersecured Claim

The Trustee does not dispute the amount of MexTex's claim relating to the Note, and accrued pre-petition interest. However, the Trustee objects to MexTex's demand for post-petition attorneys' fees on this undersecured claim. Specifically, the Trustee makes two arguments. First, that § 506(b) defines the class of claims entitled to interest and attorney fees, limiting recovery to oversecured creditors. Because MexTex's claim is not oversecured, the Trustee contends MexTex's claim for attorneys' fees is not allowable. Next, the Trustee argues that attorneys' fees sought by MexTex do not meet § 503's criterion for payment as an administrative expense. Section 503 allows fees to be paid out of a debtor's estate as an administrative expense if the costs were incurred in preserving the debtor's estate, or in recovering property for the benefit of the debtor's estate, and if such services were rendered post-petition. 11 U.S.C. § 503(b)(1) and (3).

MexTex does not assert the services performed by its attorneys resulted in a substantial contribution to the Debtor's estate. In fact, it is apparent that the legal services rendered post-petition were provided solely for MexTex's benefit as a creditor, in prosecution of its claim, and are not compensable under 11 U.S.C. § 503(b)(1) and (3). MexTex does, however, assert it is entitled to its attorneys' fees pursuant to the terms of its contract with IARE, as part of its collection costs subsequent to the Debtor's breach of the Note's terms.

It is true that the Bankruptcy Code is silent as to whether either unsecured or undersecured creditors are entitled to contractual attorney fees, costs, or charges. The existence of § 506(b) and the lack of a parallel provision as to unsecured claims does not, however, mean that MexTex's claim for attorney fees must fail. Several courts have held that contractual provisions for attorney fees are valid in bankruptcy even though a creditor is either unsecured or undersecured. *In re United Merchants & Mfrs., Inc.,* 674 F.2d 134 (2nd Cir.1982); *In re Missionary Baptist Foundation of America, Inc.,* 24 B.R. 970 (Bankr.N.D.Tex.1982); *In re Martin,* 761 F.2d 1163 (6th Cir.1985); *Liberty National Bank & Trust v. George,* 70 B.R. 312 (W.D.Ky.1987); *In re A. Tarricone, Inc.,* 83 B.R. 253 (Bankr.S.D.N.Y.1988); *In re Tri–State Homes, Inc.,* 56 B.R. 24 (Bankr. W.D.Wis.1985); *In re Lorenzo Bank Shares, Inc.,* 122 B.R. 270 (Bankr.N.D.Tex. 1991). *See, In re Continental Airlines Corp.,* 110 B.R. 276 (Bankr.S.D.Tex.1989), where the court discusses the solvency of the debtor as affecting the analysis. IARE was insolvent at all pertinent times.

The court, in *In re United,* discussed the effect of § 506(b) on an unsecured creditor's claim. It stated that neither the statute nor its legislative history sheds any light on the status of an unsecured creditor's claim for attorney fees. The Court found nothing in bankruptcy policy or case law which supported a distinction between secured and unsecured creditors who seek to recover collection costs in bankruptcy.

The Court concludes that MexTex's status as an undersecured creditor does not bar it from asserting its claim for attorney fees under the Note.

interest, and MexTex to sell it. On December 15, 1986, MexTex attempted to exercise the option by making demand upon IARE to purchase its profits interest. The sending of a letter post-petition (PX 17) violated the stay and constituted a voidable act. *Picco v. Global Marine Drilling Company,* 900 F.2d 846 (5th Cir.1990). As such, it was an ineffective attempt at exercising the option. Had MexTex filed a proof of claim within the time frame required by the option contract, or sent the letter after obtaining a lift of the stay, that would have been sufficient to support a claim in the bankruptcy context. An unsecured claim under those circumstances would have been allowed. The stay was not lifted, and no proof of claim was filed until April 13, 1987; therefore, the option expired by its own terms, and no allowable claim exists.

Under the Put Agreement for the El Paso, Texas property, MexTex was required to exercise the option within 120 days subsequent to the project's completion date, as that term was defined in the agreement. No evidence was adduced that MexTex timely exercised its option upon the project's completion. Based upon the record before the Court, it is impossible to determine whether or not the option expired prior to the filing of the bankruptcy; therefore, the Court will disallow MexTex's claim under that particular contract.

A determination of whether such a contractual provision for attorney fees or collection costs is valid is governed by state law. *In re United, supra* at 137; *In re Tri–State Homes, Inc., supra* at 26. Texas recognizes and enforces contractual provisions for attorney fees and collection costs. Tex.Civ.Prac. & Rem.Code Ann. § 38.001. The Court is unable to assess the reasonableness of MexTex's attorney fees under either the guidelines established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974) or state law, because of the way in which the attorneys' bills were formatted. Because Mex-Tex's attorneys consistently lumped their time entries, the reasonableness of the amounts charged cannot be determined. Therefore, such fees are temporarily disal-

lowed. MexTex will be permitted to supplement the record on this issue, provided that the supplement is filed within twenty days of this date, and an additional hearing is scheduled by MexTex within forty days of this date to fix the amount of its attorney fees.

### Conclusion

The Trustee's objection to the claims of MexTex is, in large part, denied. MexTex is granted an unsecured claim on the eight uncompleted shopping center projects in the amount of $1,375,000. In addition, it is entitled to an unsecured claim in the amount of the Note, any accrued pre-petition interest, and reasonable attorneys' fees to be determined at a later date.

### APPENDIX A