## EARLE v. CARSON.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 83.   Argued November 11, 1902.—Decided January 19, 1903.

1. The presumption of liability of a stockholder of a national bank begotten by the presence of the name on the stock register may be rebutted if the jury finds the fact to be that a *bona fide* sale of the stock had been made and every duty had been performed which the law imposed in order to secure a transfer on the registry of the bank. The mere reduction of the reserve of a national bank below the legal limit does not affect with a legal presumption of bad faith, all transactions made with or concerning the bank during the period whilst the reserve is impaired.

2. The power of a stockholder to transfer stock in a national bank, like other personal property, is not limited by the mere fact that at the time of the transfer the bank, which was a going concern, was insolvent in the sense that its assets, if liquidated, would *not* discharge its liabilities, unless it be shown that the seller was aware of the facts and had sold the stock in order to avoid the impending double liability.

3. Nor is such a *bona fide* sale void if the person to whom the stock is sold is, owing to his insolvency, unable to respond to the double liability, if the fact of such insolvency was, at the time of the sale, unknown to the seller.

WHEN the Chestnut Street National Bank of Philadelphia

suspended payment and its doors were closed there stood on the stock register ten shares in the name of the defendant in error. A call having been made by the Comptroller for the sum of the double liability, this suit was commenced to recover the amount. The defence was : First, that prior to the suspension of the bank the defendant had in good faith sold the stock standing in her name for a full market price, which had been paid her; second, that, in consummation of such sale, she had, by her agent delivered to the proper officer of the bank in its banking house, at the place where transfers were made, the stock certificate, with an adequate power of attorney to make the transfer, and requested that the stock be transferred; third, that the officer of the bank said that the transfer would be made as requested, and the defendant was ignorant of the fact that the officer had failed to discharge his duty; fourth, that as the defendant had done everything which the law required her to do to secure the transfer, she had ceased to be a stockholder, and was not responsible.

In submitting the case to the jury the court instructed, First, that the presence of the name of the defendant on the stock register created a presumption of liability. This, however, the jury was informed, was not conclusive, but might be rebutted. Such rebuttal, the court charged, would result if it was proven that the defendant had made a *bona fide* sale of her stock, and had, at the proper time and place, handed to the proper officer of the bank a power to transfer the same, although the officer of the bank had neglected to fulfill his duty in the premises. Second, after charging fully and accurately as to the proof essential to show a *bona fide* sale of stock in a national bank, the court, having during the trial applied a like rule in passing on the admissibility of evidence, instructed the jury if the evidence established that a sale of such character had been made whilst the bank was a going concern, the defendant would not be liable, because, unknown to her, the bank was, at the time of the sale, in fact insolvent. And the same principle was applied to the unknown insolvency of the person to whom the stock was sold. There was verdict and judgment for the defendant, which was affirmed by the Circuit Court of

Appeals, 107 Fed. Rep. 639; thereupon this writ of error was prosecuted.

*Mr. Asa W. Waters* and *Mr. Charles Biddle* for plaintiff in error.

*Mr. Richard C. Dale* for defendant in error.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

In the argument at bar all but three of the grounds of error specified in the Circuit Court of Appeals and assigned on the allowance of this writ were expressly waived. In stating the case we have therefore called attention only to the facts and proceedings essential to an elucidation of the three questions now pressed, and hence, disregarding the grounds of error which are obsolete, we come to consider the real issues.

1. Treating the facts as foreclosed by the verdict, the Circuit Court of Appeals held that the trial court rightly instructed that the presumption of liability begotten by the presence of the name on the stock register would be rebutted if the jury found the fact to be that a *bona fide* sale of the stock had been made and that the defendant had performed every duty which the law imposed on her in order to secure a transfer on the registry of the bank. The correctness of this ruling is not open to controversy. *Matteson* v. *Dent*, 176 U. S. 521; *Whitney* v. *Butler*, 118 U. S. 655. But, it is urged, the court erroneously assumed the *bona fides* of the sale to have been concluded by the verdict, since the trial court mistakenly refused to instruct the jury that the sale of the stock, though in every other respect lawful, could not be so treated by the jury if, as a matter of fact, it was found that at the time of the sale, to the knowledge of the defendant, the reserve of the bank was below the limit fixed by law. Rev. Stat. sec. 5191. To sustain this contention it is argued that by operation of law when the reserve of a national bank falls below the maximum provided in the statute, every transfer of stock made by a per-

son having knowledge of the fact creates a legal presumption of bad faith, and therefore, in the event of the future suspension of the bank, avoids the transaction. But the statute creates no presumption of inability to continue business as a consequence of the reduction of the reserve below the legal requirement. On the contrary, the statute expressly contemplates the continuance of business by a bank, although its reserve may have fallen below the standard, since it merely forbids the making by a bank of certain enumerated transactions during the period when the reserve is impaired. Whether the provisions just referred to are mandatory or directory, we are not called upon to determine, but certainly, in either event, they clearly refute the construction of the statute which would be necessary in order to sustain the proposition. True, the law confers authority on the Comptroller in his discretion to require a bank, whose reserve has fallen below the legal limit, to restore the reserve within thirty days, and moreover gives power to the Comptroller, with the approval of the Secretary of the Treasury, to appoint a receiver when a bank fails to comply after the thirty days with the demand made. These provisions, however, but add cogency to the view that it cannot be implied that the mere reduction of the reserve below the legal limit, as a matter of law, suspends the business of the bank, or, what would be tantamount thereto, affects, with a legal presumption of bad faith, all transactions made with or concerning the bank during the period whilst the reserve is impaired.

2. The proposition which arises under this head is, that it was erroneously ruled that the insolvency of the bank when the sale of stock was made was irrelevant unless the fact of insolvency was known to the seller and the sale was made to avoid impending liability, that is, in contemplation of insolvency. It is undisputed that at the date when the stock was sold the doors of the bank were open and it had not failed in business. Hence the proposition is this : Although a national bank has not suspended payment, all sales of its stock, whatever may be the good faith with which they are made, are void if it develops that at the date of the sale the assets of the bank, if they had

been then realized on, would have been insufficient to pay its debts. The proposition is supported by what is assumed to be the essential nature of the double liability of a stockholder in a national bank and the time when such liability by operation of law becomes irrevocably fixed. Passing for a moment an analysis of the premises upon which the argument proceeds, let us determine the result to which it necessarily leads. Proceeding to do so, it becomes clear that the effect of maintaining the argument would be to virtually prevent the exercise of the power to transfer stock "like other personal property," which the statute gives in express terms. Rev. Stat. sec. 5139. That such would be the result if the validity of every sale of stock depended, not upon the good faith of the seller, but upon the condition of the bank as subsequently developed, is, we think, obvious. Certainly it cannot in reason be said that the power would exist to sell stock like any other personal property if before the power could be exercised the seller must examine the affairs of the bank, marshal its assets and liabilities in order to form an accurate judgment as to the precise condition of the bank. But it has long since been pointed out, *Bank* v. *Lanier*, 11 Wall. 369, 377, that—

"The power to transfer their stock is one of the most valuable franchises conferred by Congress on banking associations. Without this power, it can readily be seen the value of the stock would be greatly lessened, and, obviously, whatever contributes to make the shares of the stock a safe mode of investment, and easily convertible, tends to enhance their value. It is no less the interest of the shareholder, than the public, that the certificate representing his stock should be in a form to secure public confidence, for without this he could not negotiate it to any advantage.

. "It is in obedience to this requirement, that stock certificates of all kinds have been constructed in a way to invite the confidence of business men, so that they have become the basis of commercial transactions in all the large cities of the country, and are sold in open market the same as other securities. Although neither in form nor character negotiable paper, they approximate to it as nearly as practicable."

And in the same case (p. 376) attention was called to the fact that the purpose of Congress in making the certificates transferable had been clearly manifested by the repeal, in adopting the national banking act of 1864, of section 36 of the act of 1863, which subjected any transfer of stock in a national bank to debts due to the bank by the seller of the stock. To maintain the proposition, then, would compel us to give an interpretation to the statute which would destroy one of its essential features under the guise of giving effect to another provision of the same statute; in other words, to destroy the law under the pretext of enforcing it.' But the controlling principle is, that, when reasonably possible, a statute should be so interpreted as to harmonize all its requirements by giving effect to the whole.

Moreover, when other parts of the statute are brought into view the *reductio ad absurdum* to which the proposition leads is additionally shown. Thus, it is provided, Rev. Stat. sec. 5242, that—

" All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another except in payment of its circulating notes, shall be utterly null and void; . . ."

This by a negative affirmative establishes the validity of all contracts otherwise lawful made by the bank concerning its assets before its failure albeit at the time such contracts were made the bank was insolvent, unless the contracts come within the restrictions which the section imposes—that is, those entered into after the commission of an act of insolvency or in contemplation thereof or made with a view to prevent the application of the assets of the bank in the manner prescribed by law or with the purpose of giving a preference to one creditor over another. If the

proposition were sustained it would thus come to pass that the power of stockholders to freely transfer their stock like any other personal property would be burdened with a restriction arising from the unknown insolvency of the bank, whilst such limitation would not apply to any other contract concerning the property or affairs of the bank. This would be to hold that the statute had conferred the lesser freedom of contract where it was its avowed purpose to give the greater. It would besides require us to say that a limitation resulting from unknown insolvency was made effective upon a stockholder in transferring his stock when such restriction was not made operative on the bank and its officers when they entered into contracts. But this would cause the unknown insolvency to restrict the power of the person less likely to be aware of its existence and to cause it not to be controlling where knowledge was most apt to obtain. Taking into view the whole act, the provision conferring the power to transfer stock ; the one already referred to which avoids contracts made in contemplation of insolvency ; the authority conferred upon the Comptroller to constantly test the condition of a national bank ; the right given him to suspend the business of such bank when the exigencies of its situation require it, and the double liability imposed on the registered stockholders, we think it results that the power to transfer stock, like other personal property, is not limited by the mere fact that at the time of the transfer the bank, which was a going concern, was insolvent in the sense that its assets, if liquidated, would not discharge its liabilities, unless it be shown that the seller was aware of the fact and had sold his stock to avoid the double liability which was impending.

Let us come, however, to consider the matter in the light of authority. It is clear that the assertion that the power to transfer the stock was limited by the unknown insolvency of the bank does not rest upon any express provision of the statute, but is deduced from mere implications which it is deemed must be drawn from the statute as a whole. But the settled rule hitherto enunciated by this court, in accord with the rule obtaining in the English courts, is, that where an express power is given to transfer stock, such power may not be rendered

nugatory by implication. This general principle, however, is, by the decisions of this court, subjected to a limitation which does not prevail in England; that is, that the exercise of the power to transfer stock in a national bank is controlled by the rules of good faith applicable to other contracts. The qualification just stated gives no support to the proposition that where a sale of stock in a national bank is made in good faith, nevertheless the consequences of the sale are avoided if subsequently it developed that the bank was insolvent at the time of the transfer, in the sense that its assets were then unequal to the discharge of its liabilities, when such fact was unknown to the seller of the stock at the time of the sale. Without undertaking to refer to the numerous cases in which the subject has been variously considered since the adoption of the national banking act in 1863, we advert to some of the leading authorities.

In *National Bank* v. *Case,* 99 U. S. 629, the proof concerning the insolvency of the bank was thus stated in the opinion of the court :

" The Crescent City National Bank of New Orleans was organized under the national banking law in 1871. On the 13th of February, 1873, its London correspondents failed and the bank lost heavily by the failure—nearly the entire amount of its capital. This loss was almost immediately known in the community where the institution was located, and necessarily affected its credit. On ' he 14th of March, 1873, payment of checks drawn upon it by ts depositors was suspended, and on the 17th of the same month its circulating notes went to protest."

As a result of the failure of the bank its doors were closed and suit was brought by the receiver to recover from the Germania the sum of its double liability on one hundred and three shares of stock which had previously stood in the name of the Germania on the stock register of the Crescent Bank. The stock in question had been acquired and registered in the name of the Germania on the tenth day of March, 1873, and the Germania had on the same day caused it to be transferred on the register from its own name to that of Waldo, one of its clerks. The court, in enforcing the liability, said:

"While it is true that shareholders of the stock of a corporation generally have a right to transfer their shares, and thus disconnect themselves from the corporation and from any responsibility on account of it, it is equally true that there are some limits to this right. A transfer for the mere purpose of avoiding his liability to the company or its creditors is fraudulent and void, and he remains still liable. The English cases, it is admitted, give effect to such transfers, if they are made (as it is called) 'out and out;' that is, completely, so as to divest the transferrer of all interest in the stock. But even in them it is held that if the transfer is merely colorable, or, as sometimes coarsely denominated, a sham—if, in fact, the transferee is a mere tool or nominee of the transferrer, so that, as between themselves, there has been no real transfer, 'but in the event of the company becoming prosperous the transferrer would become interested in the profits, the transfer will be held for naught, and the transferrer will be put upon the list of contributories.' *Williams' Case*, Law Rep. 9 Eq. 225, note, where the transfer was, as in the present case, made to a clerk of the transferrer without consideration; *Payne's Case*, L. R. 9 Eq. 223; *Kintrea's Case*, Law Rep. 5 Ch. 95. See also Lindley on Partnership, 2d ed. page 1352; *Chinnock's Case*, 1 Johns. (Eng.) chap. 714; *Hyam's Case*, 1 De G. F. & J. 75; *Budd's Case*, 3 De G. F. & J. 296. The American doctrine is even more stringent. Mr. Thompson states it thus, and he is supported by the adjudicated cases : 'A transfer of shares in a failing corporation, made by the transferrer with the purpose of escaping his liability as a shareholder, to a person who, from any cause, is incapable of responding in respect to such liability, is void as to the creditors of the company and to other shareholders, although as between the transferrer and the transferee it was out and out.' "

It was decided, however, that it was not necessary to apply the more stringent American rule, since it was found that the transfer under consideration was not real, but was fraudulent and collusive. As from the undisputed facts stated by the court in its opinion, the bank became insolvent in the sense that its assets were unequal to pay its debts in February, 1873,

nearly a month before the alleged sale was made, it follows that everything said in the opinion of the court as to the fraudulent and collusive nature of the transfer, was wholly unnecessary if mere insolvency avoided the sale and affixed the liability. But it clearly appears from the reasoning of the court that the investigation of the question of fraud and collusion was essential because it was deemed that insolvency alone did not avoid the transfer. The ruling, therefore, was directly adverse to the construction of the law now relied upon.

*Bowden* v. *Johnson*, 107 U. S. 251, also involved whether a stockholder in a national bank was liable despite a transfer made by him of his stock. It was asserted that he was, first, because he had made the sale with knowledge of the approaching failure of the bank and to avoid the double liability which was impending; and, second, because the sale had been collusively made to a person who was known by the seller to be insolvent and unable to respond to the double liability. The undoubted fact was, although the bank had not suspended, that at the time of the transfer it was insolvent in the sense that its assets were not equal to the discharge of its liabilities. In considering whether the stockholder was liable, the court said:

" As such shareholder, he became subject to the individual liability prescribed by the statute. This liability attached to him until, without fraud as against the creditors of the bank, for whose protection the liability was imposed, he should relieve himself from it. He could do so by a *bona fide* transfer of the stock."

Having thus held that there could be no liability if the sale of stock had been made in good faith, and hence excluding the power to avoid the transfer merely because of the insolvency of the bank at the time when the sale was made, the court proceeded to examine the question of good faith and to reënunciate the principle which had been previously stated in *National Bank* v. *Case, supra.* The court said (p. 261):

" But where the transferrer, possessed of information showing that there is good ground to apprehend the failure of the bank, colludes and combines, as in this case, with an irresponsible

transferee, with the design of substituting the latter in his place, and of thus leaving no one with any ability to respond for the individual liability imposed by the statute, in respect of the shares of stock transferred, the transaction will be decreed to be a fraud on the creditors, and he will be held to the same liability to the creditors as before the transfer."

Answering the contention that even admitting the sale to have been made with knowledge of impending failure to avoid the liability to arise therefrom, it could not be avoided because the sale was intended between the parties to be real, or, to use the expression referred to in *National Bank* v. *Case*, was an out and out sale, the court, in declining to follow the English cases and in adhering to the broader doctrine adverted to in *National Bank* v. *Case*, said : "But it was held by this court in *National Bank* v. *Case*, 99 U. S. 628, that a transfer on the books of the bank is not in all cases enough to extinguish liability. The court, in that case, defined as one limit of the right to transfer, that the transfer must be out and out, or one really transferring the ownership as between the parties to it. But there is nothing in the statute excluding, as another limit, that the transfer must not be to a person known to be irresponsible, and collusively made, with the intent of escaping liability, and defeating the rights given by statute to creditors."

In *Whitney* v. *Butler*, 118 U. S. 655, the facts were these : A stockholder in the Pacific National Bank of Boston sold his stock on the 8th of November, 1881. Ten days thereafter, on November the 18th, the bank suspended payment and closed its doors. Beyond doubt the bank was insolvent on the 8th of November when the stock was sold, since the Comptroller certified, on the 16th of December, 1881, that the result of his investigation disclosed that "the entire capital stock," amounting to $961,300, had been lost. See statement of facts, *Delano* v. *Butler*, 118 U. S. 634, 638, which statement was also a part of the record in *Whitney* v. *Butler*. The defence of the stockholder, against whom the double liability was sought to be enforced, was that, having sold his stock and performed every duty required of him to secure a transfer, he was no longer liable, although his name remained upon the register. The court,

after expressly stating (p. 658) the good faith of the defendant, because he had no reason whatever " to believe that the bank was insolvent, or was about to become so," and treating the sale as valid for that reason, proceeded to hold that the stockholder was not liable, because he had done everything in his power to secure the transfer, and hence his name remained on the register by the neglect of the officers of the bank.   It requires no comment to demonstrate that that case was wrongly decided if the contention now made is sustainable.

In *Stuart* v. *Hayden*, 169 U. S. 2, the facts were these :  Stuart was an owner of shares in the Capital National Bank of Lincoln, Nebraska.   He was a director of the bank and a member of its finance committee.   On the 22d day of December, 1892, in consequence of contracts made by Stuart with Gruetter & Joers, Stuart delivered to them his certificates of stock, with the power to transfer, and a few days afterwards the stock was transferred.   On the 6th of February, 1893, the bank failed. That the bank was insolvent at the date of the sale appears on the face of the opinion, for the court said :

" The bank closed its doors within less than three weeks after the stock was transferred on its books to Gruetter & Joers, its total assets being about $900,000, and total liabilities $1,463,013.17. Its bills receivable on hand were $519,600, of which $58,596.82 were good, $141,393.27 were doubtful, and $319,611.90 were worthless.   Its bills receivable not on hand amounted to $141,000, of which only $10,000 were worth anything."

The question presented for decision was, whether Stuart continued liable despite the transfer made to Gruetter & Joers. The court elaborately stated the facts, directed attention to the finding by the court below that at the time of the sale the bank was absolutely insolvent, and proceeded to enforce the liability against Stuart solely because, being a director of the bank and a member of its finance committee, he had knowledge of the insolvency, and therefore the sale was in bad faith.   Manifestly, this case also reiterates the doctrine announced in the previous cases and excludes the conception that the mere fact of unknown insolvency avoids the transfer, since every word of the careful statement in the opinion on the facts showing knowl-

edge would have been wholly unnecessary if the doctrine now asserted were well founded.

From what has previously been said and the cases just referred to, it is demonstrated that the contention now made is not supported by the statute, and is foreclosed by the decisions of this court. But it is suggested the rule announced in the previous cases is shown to have been a mistaken one by an observation in the opinion in *Stuart* v. *Hayden, supra*. The passage referred to (p. 9) is as follows:

"Whether—the bank being in fact insolvent—the transferrer is liable to be treated as a shareholder, in respect of its existing contracts, debts and engagements, if he believed in good faith, at the time of transfer, that the bank was solvent, is a question which, in the view we take of the present case, need not be discussed; although he may be so treated, even when acting in good faith, if the transfer is to one who is financially irresponsible."

But this remark does not purport to pass upon the question which it suggests, but simply reserves it. The argument, however, is that the opinion would not have reserved a question which had been conclusively foreclosed. The suggestion is based on a misconception of the sentences relied on. Obviously the observations in *Stuart* v. *Hayden* cannot in reason be construed as throwing doubt upon the doctrine announced in the opinion in which the expressions relied on are contained. This would be, however, the case if the significance now attributed to the language were sound. The error of the argument arises from the fact that it affixes to the word insolvency, as found in the sentences quoted, the erroneous import hitherto pointed out; that is, an inadequacy of the assets of a bank to pay its liabilities instead of giving to it its true meaning, that of failure and consequent suspension of business.

3. The proposition under this head is that as the person to whom the stock was sold in the case before us was in fact insolvent, and hence unable to respond to the double liability, the sale was void, although the fact of such insolvency of the buyer was unknown to the seller. But this in its last analysis merely again reiterates the proposition which we have previously dis-

posed of, since it but insists that the validity of the sale of the stock is to be tested, not by the good faith of the seller, but upon the unknown financial condition of the buyer. The rule on this subject was clearly stated in the passage which has already been excerpted from *Bowden* v. *Johnson*, 107 U. S. 251, where in declining to follow the English rule upholding a real or out and out sale, even if the purpose was to avoid impending liability, the court said that " the transfer must not be to a person known to be irresponsible, and collusively made, with ' the intent of escaping liability and defeating the rights given by statute to creditors," a principle which has been since expressly reiterated in *Matteson* v. *Dent*, 176 U. S. 521, 531. Here again support for the 'proposition is sought to be derived from the concluding sentence in the passage from the opinion in *Stuart* v. *Hayden*. But in any event the observation relied upon was not essential for the decision of the case of *Stuart* v. *Hayden*, and moreover its meaning is clearly shown by the context of the opinion in which the difference between the American and English rule is pointed out. When this is borne in mind it will be seen that the expression in *Stuart* v. *Hayden* referred to but stated that difference, and, being taken in connection with other clauses of the opinion in that case, must be understood as implying that a real or out and out transfer would not be adequate to relieve the seller from his liability as a stockholder if. the sale was made by him to escape this impending liability and to a person whom he knew, or had reason to know, was financially irresponsible. As the views hitherto expressed are conclusive of the meaning of the act of Congress, we deem it unnecessary to refer to the many cases from state courts of last resort construing state statutes referred to in the argument.

*Affirmed.*