**In re Karen R. KILPATRICK and Bruce L. Kilpatrick, Jr., d/b/a Sunrise Disposal and d/b/a B & K Disposal, Debtors.**

**Bankruptcy No. 91–20720.**

United States Bankruptcy Court,
E.D. Michigan,
Southern Division—Flint.

May 3, 1993.

Mark J. Vanepps, Owosso, MI, for debtor.

Mark S. Demorest, Troy, MI, for Pollard Disposal.

Carl L. Bekofske, Chapter 13 Trustee.

## OPINION ON POLLARD DISPOSAL'S MOTION REGARDING AUTOMATIC STAY

ARTHUR J. SPECTOR, Bankruptcy Judge.

### INTRODUCTION

On April 30, 1988, Bruce Kilpatrick (the "Debtor") entered into a written agreement in which he agreed to sell certain equipment to G & G Disposal Corporation. Pursuant to this agreement, the Debtor assigned to G & G all customer accounts belonging to the Debtor's company, B & K Disposal. The agreement contained a provision whereby the Debtor agreed not to compete with G & G's refuse-removal business for a period of five years in the counties of Shiawassee, Genesee, Livingston and Saginaw. The agreement required the Debtor to obtain the signatures of his co-debtor spouse and children on a separate covenant not to compete, which the Debtor did on May 1, 1988.

G & G subsequently brought a breach of contract action against the Debtor in Shiawassee County Circuit Court. On June 28, 1990, that court entered a preliminary injunc-tion which enjoined the Debtor "from engaging in any form of activity related to refuse removal in Shiawassee County." The Debtor and his wife filed their joint petition for relief under chapter 13 of the Bankruptcy Code on June 12, 1991. Their plan, which was confirmed on December 19, 1991, contained a provision on page 4 stating that "[t]he debtors reject all executory contracts or leases." Following plan confirmation, and notwithstanding the injunction, the Debtor commenced a refuse-removal business in Shiawassee County.

G & G assigned its rights under the contract to Pollard Disposal, Inc. and, on June 15, 1992, Pollard filed a "Motion for Declaratory Ruling and for Relief from Automatic Stay." In this motion, Pollard sought the following relief: (1) a determination that the circuit court's injunction is "valid and enforceable"; (2) a determination that the automatic stay does not prevent the circuit court from holding the Debtor in contempt for his post-petition violation of the injunction or, if it does, then an order lifting the stay; and (3) relief from the stay so that Pollard can enforce the covenant in state court. For the reasons which follow, the motion will be denied.

### DISCUSSION

In opposing Pollard's motion, the Debtor raised the following arguments: (1) Pollard lacks standing to bring the motion; (2) rejection of the contract relieved the Debtor of his obligation to comply with the covenant not to compete; and (3) Pollard's remedy for breach of the covenant not to compete or violation of the injunction can be reduced to money damages, and therefore Pollard holds only a claim against the Debtor which is subject to discharge pursuant to § 1328(a). These arguments will be considered *seriatim,* followed by a discussion of the automatic stay.

### 1. STANDING

The Debtor argued that the assignment between G & G and Pollard violated Michigan law because he did not receive notice of the assignment as required by Mich.Comp.

Laws § 440.6105.[1] As a result, the Debtor contended, the transfer was ineffective against him, and Pollard therefore lacks standing to sue him.

Since the Debtor's argument goes to the merits of Pollard's motion, rather than calling into question whether Pollard is "properly situated" to make the motion, it does not raise an issue as to Pollard's "standing." *See* Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3531 (1992). In any event, I need not address the validity of the Debtor's defective-assignment argument. Pollard either has a claim against the estate, or it doesn't. A determination that Pollard has a claim will in all likelihood end the matter.[2]

Conversely, if Pollard doesn't have a claim, then the state-court proceedings would be the more appropriate context in which to challenge the effectiveness of the assignment. *Cf. In re Sundale Assocs.,* 11 B.R. 978, 980–81 (Bankr.S.D.Fla.1981) (debtors' contention that mortgagee waived accrued interest should be litigated in the pending state-court foreclosure proceeding, rather than in connection with the mortgagee's request for relief from the automatic stay). I therefore assume that the assignment is valid for present purposes.[3]

### 2. *EFFECT OF REJECTION*

■ The Debtor contended that the covenant is unenforceable because the agreement of which it is a part was rejected, pursuant to 11 U.S.C. §§ 1322(b)(7) and 365(a), by the terms of the Debtor's confirmed plan. Although some courts lend credence to this theory, it is riddled with problems. First and foremost, it is difficult to reconcile such a contention with the fact that the nondebtor party to a rejected contract is deemed to have a breach-of-contract claim against the debtor under 11 U.S.C. § 365(g). A party would presumably have no such claim if the underlying contract were no longer valid. As has been persuasively argued by others, the theory that rejection somehow "vaporizes" the subject agreement serves no recognized policy, has no statutory or historical support, and inappropriately transforms the "power" to reject (i.e., decline to assume) a contract into some kind of avoiding power. *See* Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection",* 59 U.Colo.L.Rev. 845, 901–31 (1988); *see also* Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn.L.Rev. 227, 239 (1989) (lamenting the "step taken by a number of courts, positing that obligations owed to the Other Party can be rejected right out of existence"). I therefore "reject" the Debtor's contention that rejection under § 365 is tantamount to rescission. *See In re Udell,* 149 B.R. 908, 911 (N.D.Ind.1993); *In re Drexel Burnham Lambert Group,* 138 B.R. 687, 708–09, 26 C.B.C.2d 1128 (Bankr. S.D.N.Y.1992).

### 3. *AVAILABILITY OF MONEY DAMAGES*

The Debtor's third argument is that Pollard's rights under the covenant and injunction constitute a "claim" under 11 U.S.C. § 101(5). That being the case, the Debtor contended, Pollard cannot obtain specific per-

---

1. That section states in pertinent part:

   [A]ny bulk transfer subject to this article ... is ineffective against any creditor of the transferor unless at least 10 days before he takes possession of the goods or pays for them, whichever happens first, the transferee gives notice of the transfer....

2. As a creditor (i.e., the holder of a claim), Pollard would be bound by the Debtor's plan, *see* 11 U.S.C. § 1327(a), and thus could not compel the Debtor to repay the claim on terms inconsistent with the plan. *See In re Walker,* 128 B.R. 465, 466–68, 21 B.C.D. 1411 (Bankr.D.Idaho 1991); *In re Barnes,* 125 B.R. 484, 485–86 (Bankr. E.D.Mich.1991). Pollard's only option would therefore be to seek a determination that the debt is nondischargeable, which is difficult to obtain in any chapter 13 proceeding, and which would be particularly difficult given the nature of this case.

3. This probably is a safe assumption, since the Debtor cited no authority for the dubious proposition that failure to provide the transfer notice required by Mich.Comp.Laws § 440.6105 precludes the transferee from asserting the same rights as the transferor enjoyed prior to transfer. And as argued by Pollard, the Debtor's assumption that the assignment at issue constituted a bulk transfer subject to Mich.Comp.Laws § 440.6105 is also suspect. *See* pp. 6–8 of Pollard's Supplemental Brief.

formance of either the covenant or the injunction, but must instead accept the same treatment of its claim as any other unsecured creditor—namely, payment under the plan on a *pro rata* basis, with any unpaid balance being discharged. Because the analysis for each is somewhat different, I will first consider this argument as it relates to the covenant, and then discuss the injunction.

## A. *The covenant not to compete*

■ The case law clearly supports the Debtor's contention that, if a nondebtor's rights under a noncompete agreement give rise to a claim, then the nondebtor is not entitled to specific performance of the agreement. *See, e.g., Udell,* 149 B.R. at 911; *Silk Plants, Etc. Franchise Systems v. Register,* 100 B.R. 360, 362–63 (M.D.Tenn.1989); *In re May,* 141 B.R. 940, 942 (Bankr.S.D.Ohio 1992); *In re Oseen,* 133 B.R. 527, 530 (Bankr.D.Idaho 1991); *cf. Ohio v. Kovacs,* 469 U.S. 274, 278–83, 105 S.Ct. 705, 707–10, 83 L.Ed.2d 649 (1985) (court order requiring the debtor to clean up polluted property gave rise to a claim dischargeable in bankruptcy). The real issue here is whether Pollard's right to enforce the covenant is tantamount to a claim.

> A "claim" is defined under the Code as a: (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5). Thus any right which can be reduced to monetary damages is a "claim," even if that right could also be enforced by means of an "equitable remedy." *See* 124 Cong.Rec. 32,393 (1978) ("[I]n some States, a judgment for specific performance may be satisfied by an alternative right to payment in the event performance is refused; in that event, the creditor entitled to specific performance would have a 'claim' for purposes of a proceeding under title 11." (*quoted in Kovacs,* 469 U.S. at 280, 105 S.Ct. at 708)).

■ By rejecting the agreement, the Debtor committed a breach. 11 U.S.C. § 365(g). The question, then, is whether the Debtor's breach of the covenant not to compete gave Pollard "a right to payment." If it did, then Pollard holds a claim, and is entitled to specific performance of the covenant only if its claim was not discharged. *See May,* 141 B.R. at 942; *In re Cox,* 53 B.R. 829, 832, 13 C.B.C.2d 772 (Bankr.M.D.Fla. 1985). Before considering whether Pollard has a claim, however, two preliminary issues must be addressed. The first is whether I must look to state law or federal law in determining if a right to payment exists.

■ It is well established that the existence of a claim in bankruptcy is generally determined by state law. *See Grogan v. Garner,* 498 U.S. 279, 283, 111 S.Ct. 654, 657, 112 L.Ed.2d 755, 763 (1991) ("The validity of a creditor's claim is determined by rules of state law."); *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); *In re Udell,* 149 B.R. 898, 903 (Bankr. N.D.Ind.1992), *rev'd on other grounds,* 149 B.R. 908 (N.D.Ind.1993). As suggested in *Butner,* an exception to this general rule may exist if "some federal interest [so] requires." Professor Westbrook and others would presumably argue that just such an "interest" is evidenced by § 502(c), which states that "[t]here shall be estimated for purpose of allowance under this section— ... (2) any right to payment arising from a right to an equitable remedy for breach of performance." *See* Westbrook, 74 Minn.L.Rev. at 277 n. 215 ("[B]ecause the Code grants such expansive power to the bankruptcy courts to estimate claims, 11 U.S.C. § 502(c) (1988), the damage remedy (the 'right to payment') almost always will be available in bankruptcy, even when it might not have been at state law."); *see also In re JRT, Inc.,* 121 B.R.

314, 321, 24 C.B.C.2d 1123 (Bankr.W.D.Mich. 1990) ("The Bankruptcy Code takes precedence over any state law regarding the effect of rejection of an executory contract.... Therefore, this court will not examine state law to determine the effect of the rejection...."); *In re Norquist*, 43 B.R. 224, 231, 11 C.B.C.2d 1146 (Bankr.E.D.Wash.1984) ("The equitable configuration of this court may very well permit a just determination and treatment of [the claim arising from a rejected contract] which could not be accomplished under the rigid application of evidentiary rules in state court.").

■ But by its own terms, § 502(c) presupposes that a "right to payment" exists in the first instance: if it does (and only if it does), then § 502(c)(2) authorizes the court to estimate the amount of that payment. *See Udell*, 149 B.R. at 903 ("By this language [i.e., § 502(c)(2) ], Congress is indicating that only when the equitable remedy gives rise to a 'right to payment' will it become a claim which the bankruptcy court can estimate and discharge. It is circular to argue that [this] power to estimate the right to payment ... leads to the conclusion that the equitable remedy for a breach gives rise to a 'right to payment' "). I therefore do not believe that the text of § 502(c) supports the conclusion that federal law determines whether a party has a right to payment from the debtor.

Moreover, interpreting § 502(c) as establishing a federal standard regarding the existence of a right to payment ignores the fact that the Code's legislative history, cited *supra* p. 564, specifically refers to state law in explaining how a court is to determine whether a party holds a claim under § 101(5). Such an interpretation would thus create a conflict between §§ 101(5) and 502(c) that is easily avoided by a more straightforward reading of the latter subsection.

For these reasons, I agree with those cases holding that applicable state law determines the existence *vel non* of a "right to payment" arising from the breach of a noncompete agreement. *See Udell*, 149 B.R. at 912 ("[T]he court agrees with the holding in *In re Audra–John Corp.*, 140 B.R. 752, 757 [23 B.C.D. 18, 26 C.B.C.2d 1554] (Bankr.

D.Minn.1992), which specifically concluded that state, not federal law identifies remedies available when seeking to enforce a covenant not to compete against the debtor...."); *Oseen*, 133 B.R. at 530 ("[t]urning to state law to define the nature of the remedy for breach of a noncompetition covenant"); *cf. Kovacs*, 469 U.S. at 282, 105 S.Ct. at 709 (citing the fact that "state law gave a state receiver total control over [the debtor's] assets" as undermining the State's contention that "no alternative right to payment" existed with respect to a court order requiring the debtor to clean up contaminated property (quoting *In re Kovacs*, 717 F.2d 984, 987 (6th Cir.1983))).

■ The second preliminary issue is which party bears the burden of proving that Pollard's rights under the breached covenant constitute a claim for Code purposes. If a proof of claim is properly challenged, the creditor must prove its validity. *See In re DeLorean Motor Co. Litigation*, 59 B.R. 329, 336–37 (E.D.Mich.1986); *In re Premo*, 116 B.R. 515, 518 (Bankr.E.D.Mich.1990). Similarly, a creditor contending that the debt owed to it is nondischargeable bears the burden of proof in an action under § 523(a). *See Grogan*, 498 U.S. at 282, 287–88, 111 S.Ct. at 657, 659–60, 112 L.Ed.2d at 761, 767. Assigning to the obligee the burden of proving that an obligation is not a claim (and hence is not subject to discharge) would be consistent with the foregoing rules. I therefore hold that Pollard must prove that the Debtor's breach of the covenant not to compete would not entitle it to monetary damages under Michigan law. *See Audra–John*, 140 B.R. at 759–61.

■ Turning to the substantive issue, monetary damages may be awarded in Michigan as compensation for violation of a valid noncompete agreement. *See, e.g., Lansing–Lewis Servs. v. Schmitt*, 188 Mich.App. 647, 651, 470 N.W.2d 405 (1991); *Brillhart v. Danneffel*, 36 Mich.App. 359, 365–67, 194 N.W.2d 63 (1971). Pollard argued, however, that the state court had "already determined ... that money damages are not an adequate remedy for [the Debtor's] breach of the Covenant." P. 9 of Pollard's Supplemental Brief.

Thus Pollard's implicit contention is that the Debtor is collaterally estopped from arguing that his breach created a right of payment vesting in Pollard.

▇▇▇ The preclusive effect of a state court ruling in federal court is determined by reference to the law of that state. *See* 28 U.S.C. § 1738; *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S.Ct. 892, 896, 79 L.Ed.2d 56 (1984); *In re Moon*, 116 B.R. 75, 78 (Bankr.E.D.Mich.1990) (collecting cases). The doctrine of collateral estoppel, which "bars the relitigation of issues previously decided when such issues are raised in a subsequent suit by the same parties based upon a different cause of action," *Roberts v. City of Troy*, 170 Mich.App. 567, 577, 429 N.W.2d 206 (1988), applies only to "an issue of ultimate fact ... determined by a valid and *final argument." Id.* (emphasis added). *See also Local 98, United Ass'n of Journeymen v. Flamegas Detroit Corp.*, 52 Mich.App. 297, 302, 217 N.W.2d 131 (1974). Since a preliminary injunction is not a "final judgment," the Debtor is not precluded from arguing that Pollard is entitled to monetary compensation for his breach. *See Hopkins v. Crantz*, 334 Mich. 300, 302–03, 54 N.W.2d 671 (1952) ("Defendant ... claims that inasmuch as the circuit judge who first heard the case on a motion for temporary injunction dissolved it, therefore, the question became *res judicata.* Decision on a preliminary motion in no way affects a final decree.").[4]

▇▇ The Debtor's primary argument in this regard is his assertion that "the fact that G & G sued for money damages of $125,000 show[s] that money damages are possible." P. 7 of Debtor's Brief. Similarly, the Debtor cited as significant the proof of claim filed by G & G. *See* p. 3 of Debtor's Addendum to Brief. In response, Pollard argued that "[t]he filing of the Complaint [by G & G seeking monetary damages as an alternative to an injunction] and the filing of the Proof of Claim are not an election of remedies." P. 4 of Pollard's Supplemental Brief.

Pollard's response to this argument misses the point. The Debtor presumably did not cite G & G's complaint and proof of claim to establish that Pollard had waived its right to equitable relief under an election-of-remedies theory,[5] but rather as evidence (for whatever it is worth) that G & G believed its damages could be reduced to a dollar figure.

However weak the Debtor's argument may be, the fact remains that it was incumbent upon Pollard to show that breach of the covenant would result in damages too difficult to estimate, and that specific performance/injunctive relief would therefore be its only viable remedy. Since all it did in this regard was to submit evidence that (arguably) demonstrated that a state court judge believed monetary damages would for some reason be. insufficient, it did not make a satisfactory showing. I therefore conclude that Pollard's rights under the covenant constitute a claim, the dischargeability of which must be litigated in the context of an adversary proceeding. *See* F.R.Bankr.P. 7001(6).

### B. *The Injunction*

The injunction gave Pollard the right to be free from the Debtor's competition in Shiawassee County pending further order of the state court. If violation of that right would give rise to a right of payment, then it would seem that Pollard holds a claim. I cannot reach that conclusion, however, without first considering the significance of the Supreme Court's decision in *Kovacs, supra.*

In that case, the State of Ohio had obtained an injunction in state court which included a provision requiring Kovacs to clean up polluted property operated by Kovacs' corporation. 469 U.S. at 276, 105 S.Ct.

---

4. Even if the injunction had preclusive effect, Pollard failed to show that the order reflected a decision by the court that monetary damages were unavailable. Although the court made a finding that Pollard "may suffer irreparable damage without the issuance of this Injunction," *see* Pollard's Brief at Exhibit 2, "demonstration that the applicant will suffer irreparable injury if a preliminary injunction is not granted" does not necessarily "include[ ] the consideration of whether an adequate legal remedy is available to the applicant." *Michigan State Employees Ass'n v. Department of Mental Health*, 421 Mich. 152, 158, 365 N.W.2d 93 (1984).

5. If that was the Debtor's (unarticulated) theory, then it is unavailing. *See infra* pp. 567–68.

at 706. In holding that Ohio's rights under that provision of the injunction amounted to a claim, the Court focused on the fact that the state sought to enforce the cleanup obligation by obtaining money from Kovacs. *Id.* at 282–83, 105 S.Ct. at 709–10. In particular, the Court made the following observations:

> The injunction surely obliged Kovacs to clean up the site. But when he failed to do so, rather than prosecute Kovacs under the environmental laws or bring civil or criminal contempt proceedings, the State secured the appointment of a receiver.... What the receiver wanted from Kovacs after bankruptcy was the money to defray cleanup costs. At oral argument in this Court, the State's counsel conceded that after the receiver was appointed, the only performance sought from Kovacs was the payment of money.... Had Kovacs furnished the necessary funds, either before or after bankruptcy, there seems little doubt that the receiver and the State would have been satisfied. On the facts before it, ... we cannot fault the Court of Appeals for concluding that the cleanup order had been converted into an obligation to pay money....

*Id. See also id.* at 283 n. 11, 105 S.Ct. at 710 n. 11 ("The automatic stay provision does not apply to suits to enforce the regulatory statutes of the State, but the enforcement of such a judgment by seeking money from the bankrupt—what the Court of Appeals for the Sixth Circuit concluded was involved in this case—is another matter.")

One could infer from these comments that *Kovacs* stands for the proposition that if violation of an injunction gives rise to both an equitable remedy and a right to payment, then the nondebtor holds a claim only if it elects to enforce its payment right. Alternatively, *Kovacs* arguably supports the contention—advanced by Pollard, *see* p. 9 of Pollard's brief—that the nondebtor holds both a claim (the right to payment) and a nonclaim (the right to equitable relief). Under either scenario, Pollard would be free to enforce the injunction so long as it did not seek monetary damages. For the reasons which follow, however, I reject both of these interpretations of *Kovacs.*

As noted, § 101(5)(B) provides that the "right to an equitable remedy for breach of performance" is a claim *"if such breach gives rise to a right to payment."* (emphasis added). The statute does *not* state that the party holding the right to an equitable remedy can avoid having that right classified as a claim by the simple expedient of disavowing any interest in pursuing its alternative right to payment. Thus the text of § 101(5)(B) strongly implies that such a party's intentions vis-a-vis enforcement of a payment right are irrelevant to the determination of whether that party holds a claim.

This interpretation of § 101(5)(B) is reinforced by the very legislative history cited by *Kovacs,* which indicates that when "a judgment for specific performance *may be* satisfied by an alternative right to payment in the event performance is refused; in that event, the creditor entitled to specific performance would have a 'claim'." 124 Cong.Rec. 32,393 (1978) (*quoted in Kovacs,* 469 U.S. at 280, 105 S.Ct. at 708; emphasis added). This passage makes clear that the *availability* of an alternative right to payment is determinative, not whether the nondebtor has demonstrated (or expressed) any inclination to enforce that right.

The foregoing excerpt from the legislative history also buttresses another point that is evident from a fair reading of the statute itself: namely, that the nondebtor's equitable rights do not constitute a "nonclaim" separate and distinct from the nondebtor's right to payment. *See also id.* ("[T]he result [under § 101(5)(B) is] that the equitable remedy [with respect to which an alternative right of payment exists] will be susceptible to being discharged in bankruptcy."). Rather, the equitable right is itself a claim by virtue of the fact that the substantive law provides the nondebtor with an alternative right to monetary damages.

Thus, interpreting *Kovacs* in either of the manners suggested would be contrary to both the language of § 101(5)(B) and that statute's legislative history. Fortunately, however, the opinion lends itself to an interpretation which does not pose this problem.

In rendering its decision, the Court quoted favorably from the opinions of both the bankruptcy court and the Sixth Circuit. The bankruptcy judge had reasoned that "[t]here is no suggestion by [the State] that [Kovacs] can render performance under the affirmative obligation other than by the payment of money. We therefore conclude that [the State] has a claim against [Kovacs]. . . ." *Id.* at 281, 105 S.Ct. at 709 (quoting *In re Kovacs,* 29 B.R. 816, 818 (Bankr.S.D.Ohio 1982)). Similarly, the Sixth Circuit observed:

> Ohio does not suggest that Kovacs is capable of personally cleaning up the environmental damage he may have caused. . . . Kovacs cannot personally clean up the waste he wrongfully released into Ohio waters. He cannot perform the affirmative obligations properly imposed upon him by the State court except by paying money or transferring over his own financial resources.

*Id.* 469 U.S. at 282, 105 S.Ct. at 709 (quoting *In re Kovacs,* 717 F.2d 984, 987–88 (6th Cir.1983)). Based in part on these comments by the lower courts, the Court observed that, "[a]s we understand it, the Court of Appeals held that, in the circumstances, the cleanup duty had been reduced to a monetary obligation." *Id. See also id.* 469 U.S. at 283, 105 S.Ct. at 710 ("[W]e cannot fault the Court of Appeals for concluding that the cleanup order had been converted into an obligation to pay money. . . ."); *id.* at 285, 105 S.Ct. at 711 ("As the case comes to us, . . . the State seeks to enforce [Kovacs'] cleanup obligation by a money judgment.").

■ As stated earlier, one could reasonably infer from *Kovacs* that it was the State's post-injunction conduct which effectively "converted" the injunction into a "money judgment." But the foregoing passages from the lower-court decisions suggest an alternative interpretation: i.e., the cleanup injunction in essence represented an obligation to

pay money, because for all practical purposes that was the only way that the debtor could carry out his obligation. So understood, *Kovacs* simply stands for the proposition that an injunction which on its face requires non-monetary performance, but which in reality obliges the debtor to spend money, creates a claim for Code purposes. Under this interpretation, the nondebtor's efforts to enforce the injunction are relevant only insofar as they contradict the nondebtor's contention that violation of the injunction did not give rise to a right of payment. *See Kovacs,* 469 U.S. at 282, 105 S.Ct. at 709 ("Ohio claims there is no alternative right to payment, but when Kovacs failed to perform, state law gave a state receiver total control over all Kovacs' assets." (quoting *Kovacs,* 717 F.2d at 987)).

Because this alternative interpretation focuses on the nature of the injunction, rather than the enforcement methods chosen by the nondebtor, it does not run afoul of § 101(5)(B). Accordingly, I conclude that *Kovacs* held only that if, as a practical matter, compliance with an injunction requires an expenditure of money on the debtor's part, then the nondebtor holds a claim. *See May,* 141 B.R. at 943 (interpreting *Kovacs* as providing that, "where the debtor must expend money to comply with an injunction, the obligation arising under the injunction is a 'debt' "[6]); *cf., e.g., Earle v. Carson,* 188 U.S. 42, 47, 23 S.Ct. 254, 256, 47 L.Ed. 373 (1903) (whenever feasible, statutes should be interpreted so as to avoid potential conflicts).

*Kovacs* therefore does not undermine the analysis suggested earlier, which is that Pollard's rights under the injunction constitute a claim if the Debtor's violation of the injunction would give rise to a right of payment.[7] As with the covenant not to compete, I must turn to state law in addressing that issue.

---

6. Because a "debt" is defined as a "liability on a claim," 11 U.S.C. § 101(12), the terms "debt" and "claim" are essentially interchangeable. *See Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990).

7. The Debtor did not allege that the only way he could comply with the injunction is to make

monetary payments, nor is there any reason to assume that that is the case. Thus *Kovacs*—as I interpret it—is not directly relevant in that regard. *Kovacs* does make clear, however, that a "breach of performance" under § 101(5)(B) encompasses violations of a state-court injunction. *See Kovacs,* 469 U.S. at 279, 283, 105 S.Ct. at 708, 710.

In Michigan, "there are three sanctions which may be available to a court to remedy or redress contemptuous behavior: (1) criminal punishment to vindicate the court's authority; (2) coercion, to force compliance with the order; and (3) compensatory relief to the complainant." *In re Contempt of Dougherty*, 429 Mich. 81, 98, 413 N.W.2d 392 (1987). As noted in *Dougherty, id.* at 97, 413 N.W.2d 392, the compensatory sanction is codified at Mich.Comp.Laws § 600.1721, which provides:

> If the alleged misconduct has caused an actual loss or injury to any person[,] the court shall order the defendant to pay such person a sufficient sum to indemnify him.... The payment and acceptance of this sum is an absolute bar to any action by the aggrieved party to recover damages for the loss or injury.

■ Thus the Debtor's violation of the injunction gave rise to two possible consequences that are nonmonetary—namely, criminal punishment or civil coercion.[8] But the important point here is that such violation also raised the possibility of monetary damages pursuant to Mich.Comp.Laws § 600.1721. Whether the injunction created a claim pursuant to § 101(5)(A) and/or (B) therefore depends on whether these monetary damages, which are theoretically available in any contempt proceeding, would actually be available to Pollard given the facts of this case. Because Pollard failed to prove that it would not be entitled to money damages, I conclude that its right to enforce the injunction via contempt proceedings is itself a claim subject to discharge.

#### 4. *AUTOMATIC STAY*

Pollard asked the Court to rule that criminal enforcement of the injunction is excepted from the automatic stay by 11 U.S.C. § 362(b)(1), which provides that "[t]he filing

of a [bankruptcy] petition ... does not operate as a stay—(1) ... of the commencement or continuation of a criminal action or proceeding against the debtor." Properly speaking, Pollard has an interest only in pursuing civil remedies against the Debtor for violating the injunction: while it presumably could bring to the state court's attention possible grounds for criminal contempt and testify in any such proceedings, the State would be the party in interest to the proceeding, not Pollard in its private capacity. *See Dougherty*, 429 Mich. at 95–96, 413 N.W.2d 392 ("In [the case of coercion,] the private party is interested in the enforcement of the order, and, the moment he is satisfied, the imprisonment ceases. On the other hand, the State alone is interested, in the enforcement of the penalty, it being a punishment which operates *in terrorem*, and by that means has a tendency to prevent a repetition of the offense in other similar cases." (quoting *People ex rel. Attorney General v. Yarowsky*, 236 Mich. 169, 172, 210 N.W. 246 (1926))). Thus to the extent Pollard seeks a determination from this Court that the Debtor's bankruptcy does not vitiate the criminal enforceability of the injunction, it arguably lacks standing to do so.

I need not address that matter, however, because Pollard obviously does have standing insofar as it seeks a determination from this Court that *Pollard* would not violate the automatic stay by initiating, or participating in, criminal contempt proceedings brought against the Debtor for violations of the injunction. Since the answer to that question turns on whether the injunction is criminally enforceable,[9] I must make that determination even if Pollard does not have standing to argue the issue directly.

■ Any criminal sanction imposed on the Debtor for violation of the injunction would of course stem from the fact that the

---

8. Whether the Debtor could actually be jailed as a means of coercion—rather than punishment— is debatable. *See Dougherty*, 429 Mich. at 94–95, 413 N.W.2d 392 (suggesting that (civil) coercion is appropriate when the defendant refuses to do something that the court ordered him to do, while criminal sanctions are invoked when the defendant does something that the court ordered him not to do).

9. For example, if criminal enforcement of the injunction is excepted from the stay by 11 U.S.C. § 362(b)(1), then one could make a strong argument that private parties are also protected by that subsection to the extent they participate in the enforcement proceedings.

Debtor competed with Pollard in Shiawassee County. I have determined that Pollard's right under the injunction to be free from the Debtor's competition amounted to a claim. Thus the issue may properly be framed as this: can a state criminalize a debtor's refusal to honor an obligation that constitutes a claim under federal bankruptcy law? For the reasons which follow, I conclude that it can do so only if the claim is nondischargeable.

As discussed above, *Kovacs* involved a state-court order requiring the debtor to clean up industrial pollution, an order which the Court ruled gave rise to a claim dischargeable in bankruptcy. The Court specifically declined to address whether "Kovacs' discharge will shield him from ... criminal contempt for not performing his obligations under the injunction *prior to* bankruptcy." *Kovacs*, 469 U.S. at 284, 105 S.Ct. at 710 (emphasis added). The highlighted portion of this excerpt is significant because it arguably betrays the Court's assumption that a *post-petition* violation of an injunction—as is involved in this case—could not be criminally sanctioned if the obligation arising under the injunction is dischargeable. This assumption is all but made explicit by the Court in a subsequent decision.

In *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 555, 110 S.Ct. 2126, 2129, 109 L.Ed.2d 588 (1990), the Court ruled that "restitution obligations imposed as conditions of probation in state criminal actions ... are 'debt[s],' as defined by § 101(11) [now § 101(12)], ... [and are therefore] dischargeable under Chapter 13." [10] In response to the argument that enforcement of the restitution order is excepted from the automatic stay by § 362(b)(1), the Court stated:

> Section 362(b)(1) does not ... explicitly [except from the stay] governmental efforts to collect restitution obligations from

a debtor.... It is not an irrational or inconsistent policy choice to permit prosecution of criminal offenses during the pendency of a bankruptcy action and at the same time to preclude probation officials from enforcing restitution orders while a debtor seeks relief under Chapter 13. Congress could well have concluded that ... a *debtor's interest in full and complete release of his obligations* outweighs society's interest in collecting *or enforcing* a restitution obligation outside the agreement reached in the Chapter 13 plan.

*Davenport*, 495 U.S. at 560–61, 110 S.Ct. at 2132 (emphasis added).

Although the Court did not explicitly so state, *Davenport* strongly supports the proposition that the State cannot impose criminal sanctions for failure to pay a dischargeable debt. That much is clear from the highlighted portion of the foregoing excerpt from the decision. The reference to the State's interest in "enforcing" (as opposed to "collecting") the obligation, an interest which the Court said was "outweigh[ed]" by the debtor's interest in a fresh start, presumably contemplates incarceration or some other form of criminal punishment. *See Davenport*, 495 U.S. at 559–60, 110 S.Ct. at 2131 (noting that "the Probation Department's enforcement mechanism is criminal rather than civil," and that its " 'right to payment' ... is secured by the debtor's freedom rather than his property"). And the Court's allusion to the primacy of the "debtor's interest in full and complete release of his obligations" makes sense only if *Davenport* is interpreted as precluding criminal enforcement by the State of any order which imposes on the debtor an obligation that constitutes a claim dischargeable in bankruptcy: any other interpretation would make a mockery of the notion that the debtor is receiving a "full and complete re-

---

10. In a previous case involving a chapter 7 debtor, the Court ruled that restitution obligations are excepted from discharge by § 523(a)(7). *Kelly v. Robinson*, 479 U.S. 36, 38, 50, 107 S.Ct. 353, 355, 361, 93 L.Ed.2d 216 (1986). Because that subsection is not applicable to chapter 13, the *Davenport* Court was obliged to confront the issue which the *Kelly* Court discussed only in

*dictum*—i.e., whether restitution is a debt. *See Davenport*, 495 U.S. at 555, 562–63, 110 S.Ct. at 2129, 2132–33. After the *Davenport* decision was handed down, Congress amended the Code to except from discharge in chapter 13 "any debt ... for restitution included in a sentence on the debtor's conviction of a crime." 11 U.S.C. § 1328(a)(3).

lease" from the indebtedness.[11]

In addition to being consistent with (if not mandated by) the Court's ruling in *Davenport*, the conclusion that a state cannot punish a debtor for failure to perform an obligation dischargeable in bankruptcy is simply a matter of common sense. The Code broadly defines "claims" subject to discharge, *see Davenport*, 495 U.S. at 558, 110 S.Ct. at 2130, and then specifically itemizes those types of claims which are not dischargeable. *See* 11 U.S.C. § 523(a). If a claim does not fall within one of the enumerated exceptions, then it defies logic (not to mention the Constitution's supremacy clause) to suggest that a state can nevertheless prosecute a debtor for refusing to pay the claim.

It is of course true that a state has a legitimate interest in insuring that parties comply with its laws and judicial decrees. *See Kelly v. Robinson*, 479 U.S. 36, 47, 107 S.Ct. 353, 359-60, 93 L.Ed.2d 216 (1986). But it is precisely that interest which Congress protected—to a *limited* degree—by means of the exceptions to discharge enumerated in § 523(a). *See* §§ 523(a)(1) and (7); *see also* § 1328(a)(3). To the extent such protection is not explicitly provided by the Code, Congress presumably determined that the debtor's interest in a fresh start should prevail over the competing interests of a state. *See Davenport*, 495 U.S. at 561, 110 S.Ct. at 2132.[12]

Accordingly, it is clear that § 362(b)(1) applies only to criminal proceedings which do not have as their objective either the collection of a dischargeable debt or the imposition of sanctions for failure to pay such a debt. *See In re Hucke*, 128 B.R. 675, 21 B.C.D. 1521 (D.Or.1991). Thus if the debt owed to Pollard arising from the injunction is dischargeable, criminal enforcement of the injunction would not be excepted from the automatic stay.[13] Rather, such enforcement would violate § 362(a)(2), which prohibits "the enforcement[ ] against the debtor ... of a judgment obtained before the commencement of the case." Pollard would therefore also violate the stay were it to seek enforcement of the injunction through criminal contempt proceedings.[14]

In the event this Court determined that § 362(b)(1) is inapplicable, Pollard asked in the alternative that the stay be lifted pursuant to § 362(d)(1) so that it can seek enforcement of the covenant and the injunction. The Debtor did not explicitly allege that there was no "cause" for granting Pollard relief from the stay pursuant to § 362(d)(1), despite the fact that he bore the burden of proof with respect to that issue. *See* 11 U.S.C. § 362(g)(2). But the Debtor's contention that Pollard holds only a claim dischargeable in bankruptcy is itself a response (albeit implicit) to Pollard's contention that the stay should be lifted. *See Udell*, 149 B.R. at 911 ("If the restrictive covenant is a 'claim,' Carpetland may seek to protect its interests and pursue its remedy as would any

---

**11.** One can only imagine the bankruptcy court's instruction to the debtor at a § 524(d) reaffirmation hearing involving a debt subject to criminal sanctions for failure to pay: "The good news is that you aren't legally obligated to reaffirm the debt. The bad news is that you could go to jail if you don't pay it."

**12.** In many cases, of course, the Code's discharge exceptions will apply. *See, e.g., Kelly*, 479 U.S. at 50, 107 S.Ct. at 361 ("[W]e hold that § 523(a)(7) preserves from discharge any condition a state criminal court imposes as part of a criminal sentence."); *Kovacs*, 469 U.S. at 284, 105 S.Ct. at 710 ("[W]e do not suggest that Kovacs' discharge will shield him from prosecution for having violated the environmental laws of Ohio...."). Thus the Code exhibits a great deal of deference to state interests, notwithstanding the tension between those interests and the objective of facilitating the debtor's fresh start.

**13.** *Davenport* lends particularly strong support for this conclusion because in that case the State really had two interests at stake: payment of the claim which it held and its interest in vindicating the authority of its courts. In this case, on the other hand, only the latter interest is implicated, since it is Pollard—rather than the State—which holds the claim arising from the injunction. Thus the interest of the State is considerably more tenuous here than it was in *Davenport*.

**14.** Even if § 362(a)(2) is not applicable to Pollard on the theory that only the State, and not Pollard, can enforce the injunction through criminal contempt, Pollard's involvement would still be an "act to collect, assess or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6). *See In re Briggs*, 143 B.R. 438, 453, 27 C.B.C.2d 874 (Bankr.E.D.Mich.1992).

other creditor involved in a bankruptcy proceeding, and therefore, Carpetland would have no right to relief from the stay.").

I have already determined that Pollard holds a claim by virtue of its rights under the covenant and the injunction. To the extent Pollard wishes to enforce this claim other than in accordance with the terms of the Debtor's plan, it can do so only if the claim is nondischargeable. *See supra* n. 2. Since this Court is of course an appropriate forum in which to bring a complaint seeking a determination of nondischargeability, no purpose would be served in granting Pollard relief from the automatic stay. *Cf. Udell, supra.*

### SUMMARY

Pollard's rights against the Debtor constitute a "claim" under the Bankruptcy Code. Pollard is therefore a creditor of the Debtor, and is bound by the terms of the Debtor's plan. If the claim is dischargeable, then criminal enforcement of the injunction would violate § 362(a)(2), and Pollard's involvement in any such proceedings would violate § 362(a)(2) and/or § 362(a)(6). The Debtor has satisfied the Court that there is no cause for lifting the stay pursuant to § 362(d)(1). Pollard's motion will accordingly be denied.